UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA     *    Case No. 19-CR-575(FB)
                                   *
                                   *    Brooklyn, New York
                                   *    December 6, 2019
      v.                             *
                                   *
MARK KOCAJ,                      *
                                   *
              Defendant.    *
                                   *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
BEFORE THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:           KEITH EDELMAN, ESQ.
                               Asst. United States Attorney
                               United States Attorney's Office
                               271 Cadman Plaza
                               Brooklyn, NY 11201

For the Defendant:            CHRISTOPHER BOOTH, ESQ.
                               Lipman & Booth LLP
                               11 Broadway
                               Suite 967
                               New York, NY  10007

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1          (Proceedings commenced at 2:37 p.m.)

2              THE CLERK:  Criminal cause for a bail application,

3      Case Number 19-CR575, United States v. Mark Kocaj.

4              Counsel, your name for record.

5              MR. EDLEMAN:  Good afternoon, Your Honor.  Keith

6      Edelman for the United States.

7              THE COURT:  Good afternoon.

8              MR. BOOTH:  Lipman & Booth, by Christopher Booth,

9      for the defendant.  Good afternoon, Your Honor.

10             THE COURT:  Good afternoon.  Good afternoon, Mr.

11     Kocaj.

12             Okay.  I understand we're here for a bail hearing.

13     Is there any agreement on bail at all?

14             MR. EDLEMAN:  There is no agreement, Your Honor.

15     The government is seeking detention, which is in accordance

16     with Pretrial Service's recommendation for the reasons set

17     forth in our detention memo, which I can emphasize and

18     elaborate to Your Honor.

19             THE COURT:  And before I get to that, counsel, what

20     is your position on bail?  Or at least, what are you

21     proposing, if anything?

22             MR. BOOTH:  Your Honor, I am proposing a bond in

23     the amount of $600,000, secured by three properties, one

24     being the defendant's home, the second property being a

25     single-family home of his brother-like friend, who is here in

1     the courtroom, and also not necessarily the house property,

2     but that same individual who owns that home is pledging

3     $138,000 in his 401K plan.

4             If you add up the equity of those two homes and the

5     138,000, it comes to $634,627. The combined income of three

6     signers that I propose is a cumulative income of $280,000 a

7     year.

8             We were recommending GPS monitoring, home detention

9     with permission to work as verified by Pretrial Services,

10    surrendering my client's passport, and travel restricted to

11    the Eastern District and Southern District.

12            THE COURT:  Okay.  Mr. Edelman, let me ask you a

13    few questions.

14            MR. EDELMAN:  Sure.

15            THE COURT:  This is an indictment that names a

16    number of defendants and, obviously, each bail determination

17    is based upon each defendant's charges and individual

18    characteristics.

19            But to some degree, there is some inference that

20    can be drawn, perhaps, at least within the corners of a

21    single indictment, as to how various defendants are treated,

22    and I do note, it's at least my understanding that there's

23    some defendants in this indictment who have been given bond.

24            There are others who have been subject to permanent

25    orders of detention.  There are others for whom -- like Mr.

1    Kocaj, it's up in the air and their hearing is present.

2          So you know -- and I'd like to know, at least to

3    the extent you're able to say, the basis for which some of

4    the defendants charged in this indictment were amenable to

5    release, particularly given the genesis or the beginning of

6    your pretrial detention memo, which goes on for several pages

7    about how mere affiliation with organized crime would be

8    sufficient to deny bail, and you cite a litany of cases that

9    at least nod in that direction.  So I'd like to hear a little

10   bit more about that.

11         MR. EDELMAN:  Sure.  So what I first note and I

12   want to make sure is clear is Mr. Kocaj is charged in two

13   indictments.

14         One indictment is based on his association with the

15   Gambino crime family an the predicate acts underlying that --

16   that charge relate to various types of fraud, including

17   honest services, wire fraud.

18         But the reason why I bring this up and the real

19   distinguishing factor between Mr. Kocaj and the other

20   defendants who the government consented to, is he's charged

21   in a second indictment with extortionate collection of

22   credit, and extortionate collection of credit conspiracy.

23         And the evidence underlying that indictment

24   includes repeated recorded statements of Mr. Kocaj --

25         THE COURT:  Before we get to that, I thought that

1    there were individuals charged in the first indictment, also

2    with those offenses, extortionate collection of credit, and

3    were any of those defendants -- did the government consent to

4    bond on any of those defendants charged in -- I know he's not

5    charged for that in this -- in that first indictment, but I

6    hope you understand my somewhat circular question.

7            MR. EDELMAN:  No, I understand, Your Honor, and the

8    answer is no.

9            THE COURT:  Okay.

10           MR. EDELMAN:  The only defendants charged in the

11   *Barca, et al.* indictment with extortion related offenses are

12   Andrew Campos, who Judge Reyes ordered permanently detained

13   after a contested bail hearing, and Vincent Fiore, who the

14   government is seeking detention on and, as Your Honor alluded

15   to, is being put off perhaps for a later date.

16           So the threats of violence that Mr. Kocaj made,

17   distinguishes him from every single other defendant to whom

18   the Government consented.  Every other defendant did not have

19   threats of violence as one of the allegations against them.

20           THE COURT:  So I listened to the recordings that

21   the government proffered.  I don't know if defense counsel

22   had an opportunity to review them.

23           MR. BOOTH:  Well, I did, Your Honor, and if I may,

24   that was called to my attention and I have mixed feelings on

25   how to proceed at this moment in light of that information.

1          I mean, obviously, the Court and the prosecution

2    being in possession of information I don't have, puts me at a

3    disadvantage and I have very, what I think are compelling

4    arguments, to be made against what's been disclosed to me

5    already.

6          So if there are things the Court has heard that I'm

7    not aware of, certainly --

8          THE COURT:  Well, we certainly can put the hearing

9    off so you have an opportunity to listen to them.

10          MR. BOOTH:  Well, the -- I said I was of two minds.

11          THE COURT:  I mean, right.

12          MR. BOOTH:  The other mind is, if the Court is --

13    the Court has seen the government's detention letter.  And if

14    the detention letter is the thrust of what the Court is

15    relying on and not something else to my disadvantage --

16          THE COURT:  Well --

17          MR. BOOTH:  -- before it is heard.

18          THE COURT:  -- I'm not -- I'm not sure.  No one is

19    trying to create a disadvantage, either for you or your

20    client.

21          And so -- and I'm not suggesting that anyone either

22    is or intending to do that, and I'm happy to give you and

23    your client whatever leeway that you need to listen to those

24    recordings and make whatever arguments you wish upon them.

25          And it may well be in your interest to do so,

because at least the way I understand the government's
proffer of the recordings is that they have provided certain
quotations from those recordings in the detention memo, which
they believe, or they proffer constitute extortionate threats
and the like.

I will say that the recordings, because they are
recordings, have conversation between persons on them, and
the government provided me the full set of the recordings and
I listened to the pinpointed areas that correspond to
quotations that are in the detention memo.

There may be other elements of that, the context of
the conversation, who else is involved, et cetera, that could
potentially benefit your client.

So I don't want to prejudice you or your client,
and I'm happy to -- you know, it wouldn't be before me, but
we're happy to put it over because you know, it is certainly
the central evidence that the -- I don't think I'm saying
anything the government would dispute.  It's the central
evidence that they relied on.

And the reason I asked for them is because I don't
want to just take one side's word about what it is, and it's
an important -- unlike other situations where the government
proffers evidence and I'm taking the lawyer's word on it,
there's actually underlying things that are quoted, and so I
asked for them.

1          So you know, I'm fully happy to put it over and

2    give you an opportunity to listen to them.  You may have

3    things that you write in response to them.

4          Obviously, you may not want to put it in writing

5    and you may just want to make it in concert with the bail

6    application.

7          There are all kinds of considerations attendant to

8    doing so, and I am not inclined to do one thing, which is to

9    play them in open court or anything like that --

10          MR. EDELMAN:  Thank you, Your Honor.

11          THE COURT:  -- because of various other context

12    and, you know, if the Government felt that in the context of

13    the bail application they only wanted to provide certain

14    snippets that the -- that's all the Court could rely on, and

15    you can look at -- listen to those snippets, that would be

16    fine with me as well.

17          In other words, there's a lot of stuff in there

18    that I don't know would or would not constitute discovery

19    material or otherwise.

20          And so -- but it is the central piece of evidence

21    that is being used by the Government as I at least also

22    confirm at least -- or my understanding from what Mr. Edelman

23    just said, which is the central -- one of the central

24    distinguishing characteristics between your client and other

25    clients who have been granted bail, which is some of the

1   things I look at, right?

2          Particularly in the same -- you know, in terms of

3   the hierarchy of offenses within the same indictment, that

4   distinguishes why the government might not consent to your

5   client.

6          So I'm happy to put it over and I'm happy to give

7   you a moment to chat with your client about it, you know, and

8   you know, I defer to the marshals about, you know, whether

9   they want you to go back over there and have a second call

10  about it.  But let me --

11          MR. EDELMAN:  Can I -- I'm sorry.  Might I just

12  respond, perhaps a little bit; because as Your Honor alluded

13  to, typically bail hearings are done by proffer without

14  underlying evidence provided.  And Your Honor requested, and

15  so of course we put it together for Your Honor.

16          But what I note is, it's extremely sensitive

17  information for a variety of reasons.  It is material that

18  will be disclosed during the course of discovery.  Make no

19  doubt.

20          But only pursuant to a strict protective order.

21  That will at least be our position and we will request that -

22  - that there be an agreement upon that.  If there's no

23  agreement upon that, we will be applying to the district

24  judge for a strict protective order governing the

25  dissemination of these materials.

1          And so I say that just as context for why I didn't

2     just simply hand over a CD this morning.

3          THE COURT:  I understand that.  And I under -- I

4     don't take what you're saying as an attempt to -- you could

5     certainly withdraw the recordings and have them not rely on

6     it, and just rely on the indictment.

7          But I take it that's not what you're doing because

8     then I'm just looking at the face of the indictment, the

9     Pretrial Services report, and you know, what your proffer is.

10         But, you know -- so I don't want to -- I'm not

11    attempting to prejudice the government's case or to

12    jeopardize either side's evaluation here.

13         So you're not required to rely on them, but if you

14    do rely on them, I do think -- just like in other cases where

15    I've seen the video of an incident in deciding whether or not

16    the offense is so dangerous that the defendant is such a

17    danger to the community that bail ought not to be considered.

18    We view videos all the time, which is why I ask.  So --

19         MR. EDELMAN:  Sure.  And videos and these types of

20    recordings obviously are different.

21         So what I would say is, we are relying on the

22    proffer in our detention memo as to what is on the

23    recordings.

24         And we are entitled, and the case law is obviously

25    very, very clear, we can proceed by proffer and say what the

evidence is, and we have said so, and there is evidence about
that.

Now look, Your Honor has listened to the
recordings, so that obviously has happened, but we're
entitled to proceed by proffer and are doing --

THE COURT:  You're entitled to proceed on proffer
but I'll tell you, your attempt to deny this defendant bail
with zero criminal history is on much shakier ground without
the recording, without the context.  You have -- you know,
you are talking about then, two threats.

One of which is not communicated to the victim even
by the -- by the virtue of the letter that you've provided
the other one, which frankly I don't also believe is
communicated to anyone, and is not clear even in the
detention memo who they're talking about, and whether it is
the defendant speaking about him employing violence or
somebody else employing violence and he's simply making an
observation.

I will tell you right now, that -- the detention
memo does not create the kind of record for someone with zero
criminal history, and the beginning part of the detention
memo, the pages about association with organized crime, et
cetera, in light of the fact that you've given, and the
government has consented to a bunch of other defendants who
have similar associations, the only thing that's the

1    differentiating factor appear to be two threats, neither of

2    which appears in the detention memo to be communicated to,

3    number one, a victim.

4           Number two, it's not clear, at least even in the

5    detention memo, whether they're simply observations of a

6    third-party that are being repeated by the defendant as

7    opposed to as an attempt to influence or be communicated by a

8    person to a victim.

9           So you know, you're certainly able to proceed by

10    proffer, but you know, you know, I'm not sure that the --

11    this is not a presumption case, correct?

12           MR. EDELMAN:  Correct, Your Honor.

13           THE COURT:  And so I'm not sure the Government

14    meets its burden on the -- on the basis of the detention memo

15    alone, particularly given the -- I do note that while I do

16    take Pretrial Service's recommendations into serious

17    consideration, the assessment of danger are based on three

18    things.

19           The nature of the incident offense, which I just

20    talked about, and how -- and what I think -- at least the

21    weak footing the Government's proffer in the detention memo

22    is, and then association and ties to organized crime

23    families, which I don't see in the detention memo as

24    discussed at all about this defendant as opposed to every

25    single other person in the detention memo.

1          So the assessment of danger, you know, rises and

2     falls as it were, on the two paragraphs on page 14 of the

3     detention memo, one of which is a long ellipses written

4     indication that number one, the quote/unquote victim, while

5     I'm not disputing is a victim but just for identification

6     purposes, may suffer various acts of violence.

7          It reads like an observation that he's making and

8     not a direct threat against somebody.

9          And there is no statement in here, and you

10    certainly could say that it was -- that this defendant

11    communicated that threat, or used a third-party to

12    communicate that threat to the victim, which obviously would

13    change my thinking on it.  But that's not what the Government

14    says in this paragraph.

15         And in the prior paragraph, I do agree that that's

16    a problematic set of statements, but if I'm looking at the

17    full set of circumstances of this defendant, that would be

18    the entirety of the criminal history and the nature of

19    dangerousness and violence attributable to him.  So --

20         MR. BOOTH:  Judge, may I?

21         THE COURT:  You know, when you're ahead it's good

22    not to talk, but you're welcome to say whatever.  Sometimes

23    it can go in the opposite direction.  Go ahead.

24         MR. BOOTH:  Judge, I was going to say, if the Court is

25    prepared to excise from its consideration what you've

1    listened to and just proceed as the Government wants, on the

2    proffer, let's do the whole thing right now.

3              THE COURT:  Well, of course now that I've kind of

4    laid out what I would do in such a circumstance, that --

5              MR. BOOTH:  Well, Judge, you know I mean --

6              THE COURT:  You know --

7              MR. BOOTH:  -- the reality is, I could show you my

8    notes, the Court said half of my arguments already.

9              THE COURT:  And look, I've been talking for a while

10   so I'm going to give Mr. Edelman a time -- you know, chance

11   to respond.  And also, if he wanted to chat with his

12   colleagues on how he'd like to proceed, or just make his

13   decision now, I'm happy to --

14             MR. EDELMAN:  I am --

15             THE COURT:  -- give the defendant time.  I can give

16   you as much time as you'd like.

17             MR. EDELMAN:  We learn to act on our feet.  What I

18   will say, Your Honor, is first off, the reason why I brought

19   up the protective order issue is, I do want to rely on the

20   recordings, so -- but I do want there to be a court order in

21   place about the scope of these recordings before disclosing

22   them.  So if we get to that point, I can talk a little bit

23   more about --

24             THE COURT:  So, I mean, that's an easy application

25   for you to make.  In other words, it is -- not to me because

1　　you want to do it in writing.  You know, you can --

2　　　　　　MR. EDELMAN:  I -- I -- I --

3　　　　　　THE COURT:  -- and you want to negotiate it with

4　　the defense counsel.

5　　　　　　MR. EDELMAN:  I could propose -- I mean, if we were

6　　trying to do this -- I have a computer.  We can have Mr.

7　　Booth listen to the recordings, but not retain a copy.  And

8　　if Your Honor endorses that as an order, we can permit that

9　　to happen.

10　　　　　　And the reason why I say this is important is

11　　because there is more -- and I think Your Honor's reading of

12　　the detention memo is fair, but it doesn't truly give the

13　　full picture, and a couple factual points I want to just make

14　　clear, and to the extent these -- the recordings bear this

15　　out a little more, I think this is why I think it's

16　　important.

17　　　　　　Number one is, in the recording from November of

18　　last year, it's important to emphasize that the statements

19　　Mr. Kocaj makes about what he can do, what he will be able to

20　　have people go commit acts of violence against a third-party.

21　　That's him saying, I can do this.  I'm happy to do this, et

22　　cetera, et cetera.  Those statements are made to the person

23　　who is ultimately the victim in May 2019.

24　　　　　　So the victim in May 2019 -- excuse me, the victim

25　　as of November 2018, has in his mind -- he knows that Mr.

Kocaj is the type of person who has this wherewithal, at
least by his own words, to have Albanians as he calls them,
go commit various acts of violence, ridden with expletives,
breaking someone's neck, finding out where someone is,
catching an f'ing beating, et cetera, et cetera.

So that is already in the victim's mind come May
2019 when this other dispute arises.  And what I'll say there
is, Mr. Kocaj does collect money through a third person that
is from the victim.

So there is direct link -- when I say direct link,
it goes from the money from the victim to another person, to
Mr. Kocaj, which is all done with the background of who Mr.
Kocaj is, and Mr. Kocaj's understanding of what will happen
if this person doesn't pay.

THE COURT:  And I had questions about that, and I
know that, you know, the government may not be prepared to
answer that.  I mean, there's sort of the unstated inference
there, that the reason the money is paid over is because of
this statement, or the set of statements.

I recognize you're talking also about the predicate
in the year before, but your statement is saying ultimately,
you know, X amount was paid by the victim, suggests but you
don't say that the victim became awre of these threats or
statements that were made to a third-party, and read like an
observation.  And you can draw that inference in different

1   ways, right?

2           You can just draw an inference by the dates of the

3   conversations and the date the money was paid.  It doesn't

4   have to be through, you know, the victim told us that he got

5   the threat through a piece of paper or heard from somebody

6   else, right?

7           MR. EDELMAN:  Correct.

8           THE COURT:  So --

9           MR. EDELMAN:  So what I will say is, we're very

10  confident that the reason the victim paid over the money was

11  because he understood what would happen if he didn't; what

12  the threats were behind that.

13          He had the underlying gambling debt, but that

14  the reason that he paid it over was because he understood

15  what was behind that debt.  He understood who the people

16  were.

17          The reason why I also bring this up is, in the

18  November 2018 recording, when Mr. Kocaj is talking with the

19  ultimate victim, he's talking about some of the same

20  associates that are later the debtors in the May 2019

21  incident.

22          So when Mr. Kocaj and the victim go back and forth

23  about different people in the community, it's those same

24  sorts of people who the victim ultimately becomes indebted

25  to.

1          I think I may have said debtor and I meant

2    creditor.  But that's also important for realizing that a

3    victim was victimized.

4          But again, I don't want to get too bogged down in

5    the sense, because we have Mr. Kocaj sating repeatedly, he

6    has the wherewithal of relying on Albanian organized crime

7    associates and figures to commit serious acts of violence.

8    He says he can do it.  He says it over, and over, and over

9    that he will -- he has the ability to do all this.

10          And the reason that doesn't happen is not because

11    Mr. Kocaj ultimately can't do it, it's because the person

12    doesn't follow back up with him and enlist his assistance,

13    which I think is an important distinction.

14          It's not as if Mr. Kocaj was just blustering and,

15    you know, when push came to shove he couldn't actually do it.

16    It's that this happened -- his assistance was not again,

17    enlisted.

18          THE COURT:  Okay.  So I know defense counsel would

19    like me to proceed without the recordings, but I'm not going

20    to do that if the Government wishes to rely on the recordings

21    and enter in a protective order, because that would prejudice

22    the Government's ability to -- or at least moot out some of

23    the points.

24          MR. EDELMAN:  Can I -- can I just have a second

25    call to think that over, whether we want to proceed on the

1    recordings or not?

2              THE COURT:  Certainly.

3              MR. EDELMAN:  A short second call for later this

4    afternoon.

5              THE COURT:  Certainly.  That's fine.

6              MR. EDELMAN:  I can also speak to Mr. Booth a

7    little more about this as well.

8              THE COURT:  Yes.  That's fine.

9              THE CLERK:  Second call.

10             THE COURT:  Okay.

11             THE CLERK:  Thank you.

12             MR. EDELMAN:  Thank you, Your Honor.

13         (Off the record from 3:02 p.m. to 4:19 p.m.)

14             THE CLERK: Second call, Case No. 19-CR-575 and 19-

15    CR-577, United States v. Mark Kocaj.

16             Counsel, your name for the record?

17             MR. EDELMAN:  Good afternoon, again, Your Honor.

18    Keith Edelman for the United States.

19             THE COURT:  Good afternoon.

20             MR. BOOTH:  Christopher Booth for the defendant,

21    Your Honor.  Thank you for the opportunity to -- I've

22    listened to the recordings, along with my paralegal.  We had

23    an agreement with the prosecution.

24             MR. EDELMAN:  Yes.  And as we discussed and just

25    wanted to put on the record and have, I guess technically,

Your Honor formally endorse, that there was an agreement that
Mr. Booth and his paralegal would be able to listen to the
recordings, which they've done. They've returned the disc
back to me.

One of the conditions was that Mr. Kocaj not
listen, but that Mr. Booth be able to discuss the substance
with Mr. Kocaj, but that Mr. Kocaj be instructed, at least at
this venture, not to discuss that substance with anyone else.

THE COURT: Okay. I'm happy to so order on the
oral record, that agreed upon stipulation or protective
order, whatever you want to call it, between the parties.
And I'm assuming, Mr. Booth, you've communicated the
appropriate restrictions to your client. Is that correct?

MR. BOOTH: I have. And you understand those?

THE DEFENDANT: I do.

THE COURT: Okay. So in light of that I'm going
to, you know, rely on my recollections of and parties are
free to refer to, as they see fit, the various components of
the recordings that were provided in support of the
government's request for detention.

Mr. Booth, anything you would like to say about the
recordings or -- that bears upon bail. And, Mr. Edelman, I
certainly will give you an opportunity to respond.

MR. EDELMAN: Thank you.

MR. BOOTH: Thank you. An initial matter, Your

1    Honor, I would like you to consider that although the

2    defendant was arrested by the FBI at his home yesterday

3    morning, around 5:00 in the morning, this should essentially

4    have been considered a voluntary surrender situation.

5         Back in June, the defendant was at his place of

6    business, CWC Contracting, where he is an employee, and the

7    federal government executed search warrants at that time.

8    They seized some of the defendant's property, along with

9    property belonging to many other people.

10        At that point it was learned that there were search

11   warrants issued by this court, and the nature of the charges

12   was included in the search warrant information.  So at that

13   point, defendant was on notice that there was this federal

14   investigation.

15        He contacted my office, retained me promptly, and

16   on July 8th, I advised the defendant without any confidential

17   statements, as to the nature of proceedings, the charges he

18   could face, that he could be held without bail, the type of

19   charges, penalties involved.

20        Knowing all that, I then contacted the government,

21   and on July 16th, I spoke with Mr. Edelman and I advised him

22   that when I learned the defendant was a target, I said, if

23   you wanted to arrest the defendant let us know and I would

24   voluntarily walk him to your office and that's how it would

25   be.

1        It didn't turn out that way, but in the interim,

2   all these months later the defendant did not flee.  The

3   defendant did not do anything untoward.

4        There were allegations yesterday with respect to

5   one of the co-defendants who the government sought to have

6   detained, that that person engaged in elicit activities

7   relative to this case, potential obstruction, things of that

8   nature.  Nothing like that with my client.

9        He continued to support his family and live at

10  home.  So he did not flee and he did not do anything that the

11  government -- you know, in seeking to detain him, I guess

12  they worried that he might do certain things.  He had the

13  opportunity to do that already and he didn't, so he has a

14  track record that he would be fine.

15       The Pretrial Services recommended no bail

16  conditions, and one of the things they relied on was an alias

17  name.  I looked into that.  When they ran the defendant's

18  pedigree information they came up with a name, Mark

19  Monumental.

20       I asked the defendant about that, and that is a

21  juxtaposition of a business that he used to work for, called

22  Monumental Construction.

23       So somewhere in the databases of records, they've

24  conflated a place he used to work with his name.  He never

25  used that alias, and I asked his family.  No one ever said

1    that he did, so that is essentially a typographic error.

2              The history of foreign travel was certainly not a

3    strong point.  The defendant is 49 years old.  I looked at

4    his passport.  It was issued in 2018.  It's a newer passport.

5    But there's only one trip in it.  It was a short vacation to

6    Italy in 2018.  He advises me, and his family advised me that

7    he has never traveled outside of the United States before

8    that.

9              So you have a 49 year old man who is born and

10   raised in New York.  His extended family is here, Your Honor.

11   You can see them here.  His brother, his wife, his 18 year

12   old son who goes to college, his nephew, his cousin, his

13   friend Alex, who is one of the potential suretors we spoke

14   about earlier.

15             His mother-in-law was here yesterday, interviewed

16   by the government but she could not be here today because

17   she's at work.  We could have clogged the courtroom with more

18   people, but I told the family the show of support was

19   sufficient.

20             So he has bonafide roots in the community, and most

21   importantly, no criminal record.  And he has a record -- is

22   verified by the Pretrial Services of being a working man.  He

23   has worked his whole life.  He had some education, West

24   Chester Community College, for a little bit.  And in 2015, he

25   began working for CWC Construction company that is subject of

1    this case, Your Honor.

2            We dispute -- there's a line in the indictment that

3    says the defendant has an ownership interest on page 8.  The

4    defendant denies having any ownership interest in CWC.  He

5    was a salaried employee.  He received a check.  He paid his

6    taxes.

7            He had no responsibility for the financial matters

8    of CWC in terms of payroll deductions, forms submitted to the

9    Department of State, and -- I'm sorry, Department of Labor.

10   And with respect to that, there are allegations here that

11   some people fraudulently obtained these certificates showing

12   that they participated in safety courses.

13           Mr. Kocaj advises that before he was employed in

14   2015, he already had his, and it was valid through this

15   period that he's been working.

16           So he did not submit any false paperwork or ask

17   anyone to do it.  That wasn't his responsibility at the job.

18   So again, that is not something that should roll over to the

19   defendant's culpability.

20           What does he do at the company?  He's a project

21   manager.

22           THE COURT:  Counsel, I appreciate a lot of this,

23   but I'm not sure there's a lot that I dispute about this, or

24   that I would conclude otherwise, vis-a-vis your client.  I

25   would like to know if there is anything you would like to say

1    about the items on the recording.

2          And let's go to that because that's on what -- a

3    lot of these factors would otherwise -- maybe the government

4    would dispute it, but in my view they favor the defendant's

5    release.  We're really here on the point of the -- that the

6    Government is pressing, which is --

7          MR. BOOTH:  All right, Your Honor.  Well, then I

8    will address in the context of my argument of the detention

9    memo itself.

10          You notice in the detention memo they ask for

11    detention of the defendant and four other individuals.  The

12    defendant stands in stark contrast to those individuals.

13    Three of those individuals are reputed members of the Gambino

14    crime family, allegedly.  My client is not.  The government

15    makes that clear, that he is not a member of the Gambino

16    crime family.

17          In addition, the fourth person who they seek

18    detention has a bonafide, allegedly corroborated, history of

19    violence.  Actual violence that my client does not.  So he

20    stands in complete contrast to those individuals.

21          I, as the Court focused in on the two paragraphs on

22    page 14 -- and I've listened to the recordings, Your Honor,

23    and with respect to that first incident in November of 2018,

24    there is audible laughing at the point when the -- the first

25    time the Albanians, quote/unquote, the Albanians is dropped;

1    when someone mentions sending in Albanians.  There's laughter

2    heard by someone.  There are multiple participants in the

3    conversation.  Hard to hear.

4         But it certainly sounds like jocularity, and when

5    this phrase comes out that I'll snatch him up, there is an

6    incredulity in when you hear the people talking about this.

7    And it's all in the hypothetical and it's conversational.

8    And most importantly, there is no evidence or assertion that

9    any violence ever came to pass.

10        And I call the Court's attention that that incident

11   in November is an uncharged crime.  The defendant is not

12   charged with that.

13        Certainly, it looks like nothing ever came of it,

14   and there is no -- no evidence that the defendant seriously

15   ever intended to do what the government asserts the

16   conversation suggests he might.

17        When you consider that that same person -- and when

18   I listened to the voice in the conversation, it was hard for

19   me to tell if the participants from the November conversation

20   were the same participants in the May of the following year

21   conversation.

22        But just think, if it is now this victim in the May

23   conversation who allegedly was trying to solicit unlawful

24   activity in the November incident, think of what that says to

25   his credibility with respect to the second incident.  All

1    right?  It makes him dirty as the day is long, and in front

2    of a jury he will be eviscerated in terms of credibility.

3           So the May conversation, it was my thinking before

4    the Court mentioned it, it's in my notes, and now having

5    heard the conversation still the same, that is the defendant

6    not saying I will do this, it is as if one person here owes

7    money to another person there, and I'm familiar with all of

8    these parties, and I'm saying wow, if that guy doesn't pay

9    up, he's going to get hurt; he could get hurt.

10          Defendant doesn't say, I'm going to do anything.

11   And there is a vein that runs through both of these separate

12   dates of -- it sounds like people are talking to motivate a

13   person to pay to avoid violence.

14          And most significantly with respect to this May

15   incident, the one for which he stands charged, there's no

16   accusation that any violence ever took place, or that the

17   alleged threats the defendant made, and I don't concede that

18   he did, because I think it's talking in generality, were ever

19   conveyed to the complainant and that's why he paid.

20          Forty-nine years with no criminal record.  The

21   level of dangerousness to the community that is normally

22   established is absent here.  The only danger ostensibly in

23   this case, is essentially to one person; this victim who, at

24   one point, is potentially a criminal and at next point has

25   the shield of a victim.  I wonder if he was an informant at

1    the time because then issues of entrapment arise, and

2    certainly credibility.  So that is a concern that's out

3    there.

4           But when you consider the life history of the

5    defendant and that he doesn't have a history of doing any of

6    this, and the government can't point to a violent thing --

7    oh, I wanted to comment, Judge, incase it caught your

8    attention.

9           There was one quote in the government's indictment

10   where the defendant makes a statement that he had a fight in

11   a diner and he stabbed the guy with a fork.  And it was

12   unusual because in the government's paper, there was no

13   context of what that is.  So I asked the defendant about

14   that.

15          When the defendant was a teenager, he had a fight

16   in a diner.  Has nothing to do with anything in his adult

17   life, and certainly didn't stab somebody with a fork 1,000

18   times.

19          So given the absence of any violence in my client's

20   background, even if you accept the government's argument that

21   in this one isolated incident -- that's what I want to call

22   to the Court's attention.

23          The thrust of these accusations against Mr. Kocaj

24   are for a limited time in November of 19.  And for that

25   limited time of no actual violence happening, they seek no

1    conditions of bail.

2              That's setting a standard of dangerousness to the

3    community that is so low that I would ask the Court to

4    decline the government's invitation to set it.

5              THE COURT:  Okay.  Mr. Edelman.

6              MR. EDELMAN:  Thank you, Your Honor.  I don't need

7    to represent all the 3142G factors.  I just want to respond

8    to what Mr. Booth said.

9              The first is -- I'll start maybe in reverse order,

10   the discussion of how this was an isolated incident.

11             I have to dispute that in the sense that when Mr.

12   Kocaj is speaking in November of 2018, he's talking about

13   people he has at the ready who he can send out.  That, while

14   it's only a recording from that one moment in time in

15   November 2018, it illustrates a more broad-reaching, existing

16   criminal capabilities.  He has people that he can send to

17   commit acts of violence and is more than willing to do so.

18             And with respect to the comment that they're

19   laughing, well, this is a recording that Your Honor listened

20   to where you pinpointed some certain spots.  It's a rather

21   long recording.  It's a full discussion.  This is not a off-

22   the-cuff comment.  It is not one thing said in jest.

23             Mr. Kocaj is the person who brings it back up and

24   he makes these repeated statements during the course of the -

25   - during the course of the conversation.

1          And quite frankly, if they're laughing about having

2   someone's -- grabbing someone by the f'ing neck and finding

3   out where he is and catching an f'ing beating and they're

4   laughing about that, I submit that actually shows callousness

5   and an actual greater risk of danger because he doesn't even

6   view those sorts of things as any big deal, if there's any

7   laughter there at all.

8          So similarly, when Mr. Booth says that this is

9   hypothetical, I would submit, that's not the right word.

10   It's planning.  It's, this is what I'm capable of doing.

11   This is what I'm willing to do if you, later victim, want me

12   to do it.  I'm happy to do it for you.

13          And as I stressed earlier, the reason why that

14   doesn't come to be is not because Mr. Kocaj wasn't able to do

15   it when called upon.  It's that the victim didn't come back

16   and say, okay, I want you to do it.

17          Mr. Booth challenges the credibility of the victim.

18   I -- obviously just saying one thing about that is, that's

19   neither here nor there for these purposes.  We're talking

20   about Mr. Kocaj's words on tape.  Nothing that we're relying

21   on for these purposes is relying on the voracity of the

22   victim.

23          And just the last bit about the fact that Mr. --

24   from the May 2019 incident in which Mr. Kocaj -- he's not --

25   I grant, he's not saying I'm going to go out and commit

1     violence unless this person pays.

2            But what he is saying is, A, he has full knowledge

3     of what will happen if the victim does not pay.  He has

4     indifference to that.  He says repeatedly that, if he doesn't

5     want to pay, he doesn't care and just let his friends do what

6     they do.  So while he's not affirmatively going and saying,

7     I'm going to commit violence, he's perfectly happy to let it

8     happen.

9            And in order for it to not happen, yes, there is

10    the risk of -- there is the threat and implied threat of

11    violence to collect money so that he doesn't get hurt.

12           But that's what the crime is.  The crime,

13    extortionate collection of credit, is causing someone to pay

14    under fear of threat of violence.

15           It doesn't have to be obviously that there is

16    violence that is committed.  That's how these -- that's how

17    these criminals work.  They work with the fear in the

18    background and the fear being spoken about, but they don't

19    actually always have to use violence in order to collect

20    their illegal proceeds.

21           So lastly, what Mr. -- Mr. Booth says that only one

22    person is in danger at this point, and I have to disagree

23    with that.  While this incident -- it actually relates to two

24    people.  The first was a potential victim.  That's who the --

25    I don't want to get too confusing, but that's who the later

1    victim perhaps wanted to have assaulted.

2           But even putting that aside, as I started with, the

3    conversations show that Mr. Kocaj has people at the ready to

4    do acts of violence.  Kind of whoever comes and solicits it.

5           So it's -- he has that network in place and those

6    contacts in place, such that he can commit acts of violence

7    if he wants.  And so it's not just that there's one person

8    that was in danger and now it's all over.  He has that ready

9    standing relationships.

10          And so while, yes, we searched -- the FBI searched

11   CWC's office in June 2019, and I spoke with Mr. Booth, and

12   yes, given the nature of all the charges we were not going to

13   accommodate all these different self-surrenders.

14          So while he knew the nature of the charges, I

15   submit the nature of the charge that he's now charged with,

16   and the sense and type of evidence that he's now presented

17   with, I submit are far different than what he believed back

18   in June 2019.

19          I will note that -- I mean, just one thing.  There

20   have been recordings now discussed and disclosed in this

21   limited format to the defense.  It's our position that Mr.

22   Kocaj didn't believe that there were any such recordings that

23   would have been taking place at the time.

24          THE COURT:  Okay.  I'm not -- I also am not going

25   to repeat my observations from earlier, but let me say a

couple of things about my view of the recordings and how they

bear upon my ultimate disposition.

I think the first set of recordings are troubling,

and they're quite troubling, and they put a lot of substance

to what's on the paper.

And I disagree with Mr. Booth's view that, you

know, a conversation for the purpose of avoiding violence

doesn't necessarily constitute a crime.

I think that is the crime of extortion, the threat

of violence to effectuate certain means, and it does suggest

associations and it does constitute a threat. Obviously,

it's for a jury to decide what to make of that.

The second recording I will say is, at various

parts, very hard to understand, and that may be a function of

the device I was listening on more than anything else.

But, you know, it is at -- it does reinforce my

reaction upon reading the statements in the detention memo

that it is not clear that it's a threat towards anyone, that

it's observational, that I'm not sure that that -- what

happens in the second recording could -- would constitute a

crime, or that anyone is actually being threatened with

violence.

But, you know, where I -- I think where I depart

from the government's view is whether the November 18 set of

conversations, including you know, the statement, I'll send

1      somebody.  It's not a problem.

2              I agree with the government that that constitutes

3      access to a knowledge of individuals.  Whether that is

4      sufficient to deny bail of someone who, in 50 years has no

5      criminal history, who has been gainfully employed, who has

6      strong family connections, who has limited travel, and where

7      you know, look, you know, this correctly or incorrectly

8      weighs into the Court's decision.

9              There are lots of bail packages in this court.

10     You can just sit in this courtroom; individuals with

11     extensive or substantial violent criminal backgrounds being

12     released on bail.

13             Here, we have someone where admittedly I am not

14     trying to sugar coat in any way or diminish the severity of

15     the November 2018 offense, but it's not -- the offense itself

16     does not actually result in violence as Mr. Booth points out.

17             But, you know, if it were combined with prior

18     problematic history, lack of community ties, and lack of

19     other conditions, then I might be inclined to decline bail.

20     But here, we also have -- you have to weigh all of these

21     factors in light of what the proposed conditions are, and we

22     have three properties being offered.

23             I understand that that's the full amount of the

24     equity in those properties.  Plus a, you know, a substantial

25     amount of retirement packaging, plus home detention and GPS

1     monitoring.

2          And you know, when you line up all of that with,

3     you know -- you know, a serious offer of proof by the

4     government as to the charged offence, you know, it becomes a

5     close call.  But the -- it's not a presumption case.

6          Also I note that the factors that are cited in the

7     Pretrial Service report and by the government, frankly, about

8     association with crime family members, et cetera, these just

9     don't bear out either in the indictment or the other

10    proffered facts, and so I can't really rely on some of the

11    things I might rely on for some of the other charged

12    individuals, that they're members of a -- you know, organized

13    crime.  They simply -- those factors as a threat of violence

14    appear to just fall away when I'm thinking about Mr. Kojac's

15    (sic) specific circumstances.

16         So in light of the substantial bail being offered,

17    the absence of any criminal history, the absence of any

18    violence in his past, or long ties to the community, I am

19    prepared to release Mr. Kojac (sic) upon the proffered

20    conditions and the bail offered by Mr. Booth.

21         I do want the parties to discuss whether there are

22    any particular conditions related to this case, such as

23    contact with co-defendants and the like, that Mr. Booth

24    didn't proffer that I should consider, because I do think

25    that that would be appropriate.

1          Look, I'm not you know, as I've stated in other

2    cases, the government can certainly appeal and you know, you

3    can request a transcript.

4          I just think that it is significant that amongst

5    the, you know -- and I recognize the other person isn't

6    charged with the offense, but you know, there was another

7    defendant earlier on just released who has a criminal

8    history, and you know, I haven't reviewed every defendant in

9    this case for that, but you know, 50 years is a long time if

10   you're talking about someone who is supposedly a --

11   associated with organized crime never to have been charged,

12   or never even been arrested.

13         So for all of those reasons, I think the bail

14   factors in a non-presumption case favor release under the

15   stringent conditions I'm about to impose.

16         MR. EDELMAN:  Could I -- I don't know if you want

17   to go through the beginnings of the bond, or I can speak with

18   Mr. Booth about --

19         THE COURT:  Well, why don't you speak so I can just

20   all do it at once?

21         MR. EDELMAN:  Sure.

22      (Counsel confer.)

23         MR. EDELMAN:  So, Your Honor, I believe --

24         THE COURT:  Can you just write those out in the

25   condition in the -- once Felix is done filling it out?

1          MR. EDELMAN:  Sure.

2          THE COURT:  And then I'll -- and then I'll explain

3    them to him.

4        (Pause)

5          THE CLERK:  Do you want electronic monitoring?

6          MR. EDELMAN:  Yes.

7          THE CLERK:  Home detention or --

8          UNIDENTIFIED SPEAKER:  I think he's got to be

9    permitted to go to work, Your Honor.

10          MR. EDELMAN:  I believe the --

11          UNIDENTIFIED SPEAKER:  If he's going to work, it

12    has to be in a specific location.  It can't be -- or location

13    --

14          THE COURT:  What I would suggest for the work

15    condition is, as approved by Pretrial Services.

16          MR. EDELMAN:  Yes, and --

17          THE COURT:  And because I think there's some

18    question about whether being able to go back to the same work

19    location would be okay.

20          And so, if there is some alternative employment or

21    something else that Pretrial Services agreed upon, we

22    wouldn't have to agree today as to what that employment

23    looked like.

24          MR. BOOTH:  I had suggested to the prosecution,

25    Your Honor, former employer.  The defendant -- because the

1  company is defunct where he was working as a result of this

2  case.

3        THE COURT:  I'll just leave it open, Pretrial

4  Services so that you don't have to come back and it can be

5  done by --

6        MR. EDELMAN:  That's fine.  And I -- just so we are

7  clear, the government may have an objection depending on

8  where, and so we may raise that in the future.

9        THE COURT:  That's fine.

10      (Counsel confers with Pretrial Services.)

11        MR. BOOTH:  Your Honor, I'm surrendering the

12  defendants passport.

13      (Counsel confers with Pretrial Services.)

14        THE COURT:  Okay.  Are we ready?

15        MR. EDELMAN:  Yes.

16        THE COURT:  Mr. Kocaj, I'm prepared to release you

17  on bail, but I can only do so if I am assured that you

18  understand the conditions on which you're being released and

19  the consequences of violating those conditions.  Okay?

20        I'm going to first explain to you what those

21  conditions are, what the consequences are, then I'm going to

22  have your family members who are, I understand, signing on to

23  the bond come up here and explain that to them.

24        If you have any questions at any time, you can just

25  let your lawyer know and I'm happy to rephrase or answer any

1    questions.  Okay?

2                THE DEFENDANT:  Understood.

3                THE COURT:  So you're certain -- you're subject to

4    certain conditions.  The -- you're under the supervision of

5    Pretrial Services.

6                What that means is, they can visit you at home or

7    any place of work.  They can also -- and they can do so

8    randomly.  Okay?  They also can say please see us at a

9    certain place and a certain time, and you're required to

10   comply with that.

11               You're also subject to home incarceration and home

12   detention.  Rather -- excuse me, home detention, and you can

13   only leave to go to work or meet with your lawyer and the

14   work has to be approved by Pretrial Services.  Okay?

15               Relatedly, you're subject to a travel restriction.

16   Okay?  Which basically means that you can't leave Long

17   Island, New York City -- excuse me -- West Chester, Rockland,

18   Dutchess County.  If you have any questions about the

19   northern counties, you can ask your lawyer who will explain

20   to you.

21               You're also subject to what's known as a contact

22   restriction.  You can't speak with or contact in any way, any

23   co-defendant unless your lawyer is present.  You also cannot

24   contact or attempt to contact any victim, witness, or any

25   known members or associates of associate -- of organized

1   crime.

2          Now, this is not a kind of condition that is -- you

3   disobey and seek forgiveness.  Okay.  You need to seek

4   permission in advance, and so if you have any doubt as to

5   whether someone falls in one of these categories, you should

6   call your lawyer who can try and verify whether or not it's

7   appropriate for you to speak with that person or to meet with

8   that person.

9          You're also subject to what are known as the

10  standard conditions of supervised -- of bail, which apply to

11  anyone who is released from this court.

12         You can't possess a firearm or any destructive

13  device.  You can't possess any narcotic drug or controlled

14  substance unless you have a licensed doctor's prescription.

15  You can't change your phone number or your address without

16  notifying the government, your lawyer, and the court, and

17  Pretrial Services in writing.  You also may not violate any

18  local law, any state law, or any federal law.  Okay?

19         Do you understand those conditions, sir?

20         THE DEFENDANT:  I do.

21         THE COURT:  Okay.  Let me explain to you what the

22  consequences are.  If you were to violate any of these

23  conditions or not come to court as you're required to, you

24  could be subject to a prosecution for bail jumping.  You also

25  -- the Court would also issue an arrest warrant and you would

1    be brought to court and you would be denied bail until the

2    conclusion of any trial.

3          As I mentioned, it is one condition that you may

4    not violate any state law, any local law, or any federal law.

5    If you were to commit a crime while you're out on release,

6    you're subject to three separate prosecutions.  Okay?

7          One is for the crimes you've been charged with in

8    this indictment.  The second is for any crime that you commit

9    while out on release.  The third, it is a separate federal

10   crime to commit a crime while out on bail.

11         If you are prosecuted and found guilty for that

12   third crime, committing a crime while out on bail, any

13   sentence for that crime would -- would be imposed consecutive

14   to, which means it would come after any sentence you would

15   receive in this case.

16         It is -- as I mentioned, you are subject to a

17   contact restriction which includes victims and witnesses.

18   It's a crime to interfere with any victim, witness, or juror

19   in your case.

20         Also, you have family members who are signing on

21   to, and you're signing on to a $600,000 bond, plus -- which

22   is secured by property, plus a 401(k).

23         Now here's the consequence to you if you violate a

24   condition or don't come to court.  The government could seek

25   to collect that money from you.

1          But also, they would seek to collect that money

2   from those properties and from the retirement accounts, from

3   those individuals your family members who have come forward

4   here, and friends, to support you today.  Okay?

5          Which means that you would have serious financial

6   consequences upon them, and as I understand it, we're talking

7   about the remaining equity in the home, which means they

8   would be losing their homes and be kicked out if you were to

9   violate any of these conditions or fail to return to court,

10  okay?  Which means that they would have nowhere else to live.

11  Okay?

12         Do you have any questions about any of these

13  consequences, sir?

14              THE DEFENDANT:  No.

15              THE COURT:  Okay.  I'm happy to have the suretors

16  come forward, please.

17              THE CLERK:  Is there another suretor?

18              MR. BOOTH:  Your Honor.

19              THE COURT:  Okay.

20              MR. BOOTH:  This is Alex Squarely (ph), who is

21  putting up the home.

22              THE COURT:  Okay.

23              MR. BOOTH:  And the defendant's wife.

24              THE COURT:  And we have a third suretor?

25              MR. BOOTH:  Yeah, and I thought he was here.  He

1      was here yesterday, Alex, but he's not here today.

2          (Pause)

3              THE COURT:  Okay.  Mr. Booth, let me ask you this;

4      whose retirement account are we talking about?

5              MR. BOOTH:  Mr. Squarely.

6              THE COURT:  Okay.  And the home at Chauncey Street,

7      who does that belong to?

8          (No audible response.)

9              THE COURT:  Okay.  And the Valley View Drive Road?

10         (No audible response.)

11             THE COURT:  Okay.  And so, Mr. -- Mr. Peter

12     Cosiledge (ph) would be signing on for -- for which property?

13             MR. BOOTH:  No, not with respect to the properties,

14     Your Honor.  Just an additional signer --

15             THE COURT:  Okay.  So --

16             MR. BOOTH:  -- pledging his income.

17             THE COURT:  -- this is what I'm going to do.  I'm

18     going to release your client, provided I find that Mr.

19     Squarely and Ms. Senna understand and are appropriate

20     suretors, and I'm going to have -- require that Mr. Peter

21     Cosiledge come in by Monday to sign on to the bond.

22             MR. EDELMAN:  Your Honor, on --

23             MR. BOOTH:  There's one other mixup here I'm

24     apologizing for.  Present standing here, Your Honor, is

25     Laurie Messina.  That's the defendant's wife.  Vivian Messina

1     is the defendant's mother-in-law.  She was the signer that

2     was here yesterday and met with Mr. Edelman.  So the wrong

3     Ms. Messina came up.  The mother-in-law is not here today

4     because she had to go to work, so I would ask the Court the

5     same consideration to allow her to come in along with Peter

6     next week.

7              If that's not satisfactory, I do have other

8     relatives here who I could swap in.

9              THE COURT:  Is that satisfactory to the --

10             MR. EDELMAN:  Yes, in principle.  The only thing is

11    we -- I don't know anything about the new people who are

12    being thrown in, as to whether they're financially

13    responsible.

14             THE COURT:  Well, what I was going to say is, I was

15    not going to suggest replacement.

16             MR. EDELMAN:  Okay.

17             THE COURT:  I was going to suggest that because the

18    property and the 401(k) signers are here, and the other two

19    are moral suasion suretors who would also be liable to the

20    $600,000 amount, that they be permitted until close of

21    business Monday to come forward and sign in front of whoever

22    is on duty on that date.

23             MR. EDELMAN:  That's fine, Your Honor.  Obviously,

24    you know our overall position.

25             THE COURT:  Yes.

1          MR. EDELMAN:  But with understanding that, that's

2    fine.  And I also will note -- I mentioned this to Mr. Booth,

3    but just so Mr. Kocaj can hear, we're not going to appeal

4    Your Honor's decision.

5          THE COURT:  Okay.

6          THE CLERK:  Judge, I'm going to ask some questions.

7    I'll put you under oath.  Please raise your hand.

8          (The suretor is sworn.)

9          THE CLERK:  Please say your first name and speak

10   loudly, this is being recorded.

11         MR. SQUARELY:  Alex Squarely.

12         THE CLERK:  Thank you.

13         THE COURT:  Okay.  Mr. Squarely, you understand

14   that I'm going -- well, first of all, what's your

15   relationship to Mr. Kocaj?

16         MR. SQUARELY:  We grew up together.

17         THE COURT:  Okay.

18         MR. SQUARELY:  Childhood.  Next door neighbors 35

19   years.

20         THE COURT:  And how often do you, or regularly do

21   you speak with him, or see him?

22         MR. SQUARELY:  Twice a week.  We were in each

23   other's wedding parties.  Best of friends.

24         THE COURT:  Okay.  And, sir, what do you do for a

25   living?

1    MR. SQUARELY:  I'm a resident property manager in

2  Manhattan.

3          THE COURT:  Okay.  And what's your approximate

4  yearly income?

5          MR. SQUARELY:  I'm sorry?

6          THE COURT:  What's your approximate yearly income?

7          MR. SQUARELY:  About 105,000.

8          THE COURT:  Okay.  And so what are you signing,

9  what property or --

10          MR. SQUARELY:  35 Valley View Drive, which is my

11  present -- my home with my wife and kids.

12          THE COURT:  Okay.

13          MR. SQUARELY:  And my retirement plan.

14          THE COURT:  Okay.  Sir, do you understand, I'm

15  releasing your friend on certain conditions, and he's being

16  charged with certain serious crimes.

17          If he were to violate any of those conditions or

18  not come to court, it would mean the government would seek to

19  collect from you --

20          MR. SQUARELY:  I understand.

21          THE COURT:  -- your family home, as well as seek to

22  collect the entirety of your 401(k) retirement account.  Do

23  you understand that?

24          MR. SQUARELY:  Yes.

25          THE COURT:  Okay.  And are you still willing to

1    sign on --

2              MR. SQUARELY:  I am.

3              THE COURT:  -- to the bond?  Okay.

4              MR. SQUARELY:  Yes.

5              THE COURT:  And I'm going to have Mr. Squarely

6    sign.  Maybe I'm a little bit confused.  Is the -- isn't the

7    defendant's wife necessary to sign on for his home?

8              MR. BOOTH:  She's not on the deed, Your Honor.

9              THE COURT:  She's not on the deed.  It's just --

10             MR. BOOTH:  Just the defendant.

11             THE COURT:  Okay.

12             THE CLERK:  Sign above your name and put your

13   address next to it.

14        (Pause)

15             THE CLERK:  And have your friend sign lower right-

16   hand corner.  Lower right-hand corner.

17        (Pause)

18             THE COURT:  Okay.  And I find that Mr. Squarely

19   understands his obligations and is a -- under consequences.

20   I also find that Mr. Kocaj understands his obligation and the

21   consequences of violating them, and I note that -- I have

22   noted on the -- it's been noted that the other two suretors

23   must come in by close of business on Monday and must be

24   vetted by the magistrate judge then.  Okay.

25             Anything else?

1          MR. EDELMAN:  Nothing else, Your Honor.

2          MR. BOOTH:  Nothing.  Nothing.  Thank you.

3          THE COURT:  Okay.  Have a nice weekend.

4       (Proceedings concluded at 5:05 p.m.)

5

6          I, CHRISTINE FIORE, Certified Electronic Court

7   Reporter and Transcriber, certify that the foregoing is a

8   correct transcript from the official electronic sound

9   recording of the proceedings in the above-entitled matter.

10

11   _Christine Fiore_

12   _____          December 12, 2019

13       Christine Fiore, CERT

14

15

16

17

18

19

20

21

22

23

24