```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -------------------------------X
      UNITED STATES OF AMERICA            19 CR 575(FB)
 3
      versus                             U. S. COURTHOUSE
 4                                       225 Cadman Plaza East
      RENATO BARCA, et al                Brooklyn, New York
 5
                     DEFENDANTS.         January 16th, 2020
 6    -------------------------------X   2:30 p. m.

 7

 8              CRIMINAL CAUSE FOR STATUS CONFERENCE
                BEFORE THE HONORABLE FREDERIC BLOCK
 9                  UNITED STATES DISTRICT JUDGE

10

11                         APPEARANCES

12
      Representing the Government:
13
      RICHARD DONOGHUE
14    UNITED STATES ATTORNEY
      EASTERN DISTRICT OF NEW YORK
15    271 CADMAN PLAZA EAST
      BROOKLYN, NEW YORK 11201
16    BY:  KEITH EDELMAN, ESQ.
           KAYLA BENSING, ESQ.
17
      Representing Defendant Renato Barca:
18
      PIERCE BAINBRIDGE BECK PRICE & HECHT, LLP
19    277 Park Avenue, 45th Floor
      New York, NY 10172
20    BY:  MELISSA MADRIGAL, ESQ.

21    Representing Defendant Andrew Campos:

22    MEISTER SEELING & FEIN, LLP
      125 Park Avenue
23    7th floor
      New York, NY 10017
24    BY:  HENRY MASUREK, ESQ.
           ILANA HARAMATI, ESQ.
25
```

```
 1                    CONTINUED APPEARANCES

 2

 3   Representing Defendant George Campos:

 4   JOHN WALLENSTEIN, ESQ.
     1100 Franklin Avenue, Suite 100
 5   Garden City, NY 11530

 6   Representing Defendant James Ciaccia:

 7   VINCENT GELARDI, ESQ.
     800 Westchester Avenue, Suite S-608
 8   Rye Brook, NY 10573

 9   Representing Defendant Benito Dizenzo:

10   LAW OFFICE OF ROCCO D'AGOSTINO
     PO BOX 1702
11   White Plains, NY 10602
     BY:  JAMES MONTELEON, ESQ.
12
     Representing Defendant Vincent Fiore:
13
     LAWRENCE DiGIANSANTE, ESQ.
14   984 Morris Park Avenue
     Bronx, NY 10462
15
     Representing Defendant Mark Kocaj:
16
     LIPMAN & BOOTH, LLP
17   11 Broadway, Suite 967
     New York, NY 10007
18   BY:  CHRISTOPHER BOOTH, ESQ.

19   Representing Defendant Richard Martino:

20   SERCARZ & RIOPELLE
     810 Seventh Avenue, Suite 620
21   New York, NY 10019
     BY:  MAURICE SERCARZ, ESQ.
22
     Representing Defendant John Simonlacaj:
23
     ARENT FOX, LLP
24   1301 Avenue Of The Americas, Floor 42
     New York, NY 10019
25   BY:  GLENN COLTON, ESQ.
```

```
 1

 2                          CONTINUED APPEARANCES

 3

 4    Representing Defendant Frank Tarul:

 5    CRAIG DIETSCH, ESQ.
      511 6th Avenue M, Ground Floor
 6    Brooklyn, NY 11215

 7    Representing Defendant Michael Tarul:

 8    KELLEY SHARKEY, ESQ.
      26 Court Street, Suite 2805
 9    Brooklyn, NY 11242

10    ALSO PRESENT:        JOHN ILARIA, PRETRIAL SERVICES OFFICER
                           CELINE FERGUSON, PRETRIAL SERVICES OFFICER
11

12

13

14

15

16

17

18

19

20

21    Reported by:

22    LISA SCHMID, CCR, RMR
      OFFICIAL COURT REPORTER
23    225 Cadman Plaza East, Room N377
      Brooklyn, New York 11201
24
      Proceedings recorded by mechanical stenography. Transcript
25    produced by Computer-Aided Transcription.
```

```
 1              THE CLERK:  Criminal Cause for a Status Conference,

 2  United States of America versus Barca.

 3              I ask all the parties if you could state your

 4  appearances for the record.

 5              MR. EDELMAN:  Good afternoon, Your Honor.  Keith

 6  Edelman and Kayla Bensing for the United States.

 7              THE COURT:  All right.  Who's going to go in order?

 8              MR. MONTELEON:  Go down the order, Judge?

 9              MR. EDELMAN:  I'll also note at counsel's table is

10  Michael Ilaria and Celine Ferguson from Pretrial.

11              MR. ILARIA:  Good afternoon, Your Honor.

12              MS. FERGUSON:  Good afternoon, Your Honor.

13              MS. MADRIGAL:  Good afternoon, Your Honor.  Melissa

14  Madrigal on behalf of Renato Barca.

15              MR. MAZUREK:  And good afternoon, Your Honor.  Henry

16  Mazurek and Ilana Haramati on behalf of Andrew Campos, who is

17  present in court in the first row in front of the gallery.

18              MR. WALLENSTEIN:  Good afternoon, Your Honor.

19  John Wallenstein on behalf of George Campos.  Mr. Campos is in

20  the back row, way in the corner, hiding from me.

21              MR. GELARDI:  Good afternoon, Your Honor.  Vince

22  Gelardi on behalf of James Ciaccia.  He is likewise in the

23  courtroom, in the third row.

24              MR. MONTELEON:  Good afternoon, Your Honor.  James

25  For defendant, Benito Dizenzo, who is in the courtroom, Your
```

```
 1    Honor, in the back.

 2              MR. DIGIANSANTE:  Good afternoon, Your Honor.

 3    Lawrence DiGiansante appearing for Mr. Vincent Fiore, who is

 4    also seated in the audience.

 5              THE COURT:  All right.  And last but not least --

 6              MR. MAZUREK:  Oh, there's more than that.

 7              MR. BOOTH:  Christopher Booth for Mr. Mark Kocaj,

 8    who is right there in the courtroom.

 9              THE COURT:  I keep forgetting the numerosity here.

10    That's eleven?

11              MR. EDELMAN:  There's 11.

12              MR. SERCARZ:  Last and perhaps least, Your Honor,

13    Maurice Sercarz for the defendant, Richard Martino, who is

14    present in the courtroom.

15              MR. COLTON:  Actually not last, Your Honor.  Glenn

16    Colton for defendant, John Simonlacaj, who is also present in

17    the courtroom.  Good afternoon.

18              MR. DIETSCH:  Good afternoon, Your Honor.  Craig

19    Dietsch on behalf of the defendant, Frank Tarul, standing in

20    the back, where they were.

21              THE COURT:  Okay.

22              MS. SHARKEY:  And Judge, last, Kelley Sharkey for

23    Michael Tarul, who is in the back, right to the right, who's

24    standing.

25              THE COURT:  All right.  Everybody, please be seated.
```

1          I guess the good news is I haven't gotten any

2     information about anybody being in violation of their terms of

3     release, but let me hear from the Government.

4          Mr. Edelman, give me a rundown since we were last

5     here.  These folks, I assume they all have been have been

6     compliant, because I know that we had a lot of discussions

7     about our concern in that respect, so I would like to hear

8     from you.

9          MR. EDELMAN:  Yes, Your Honor.

10          As to the bail condition that Your Honor has set,

11    to date -- which this is since December 5th, when most of the

12    defendants were arrested and released or after that point --

13    we haven't had any violations of supervised -- of pretrial

14    release at this time.

15          THE COURT:  Well, I'm glad to hear that.

16          Now, I know when I was last here, we did grant bail

17    to Campos, Jr. and so I'm particularly concerned about that,

18    because that was the one where we had a reverse -- or not

19    reverse.  We had new information with the magistrate judge's

20    determination.  All the others, I think had been given bail by

21    a magistrate judge, if I remember correctly.

22          MR. EDELMAN:  That's almost correct.  At that point,

23    everyone except for Mr. Campos and Mr. Fiore had been

24    released.  After that point, Mr. Fiore was ordered released by

25    Judge Bloom.  I believe it was last week or two weeks ago.

1          THE COURT:  All right.  That wasn't me.  That was

2     Judge Bloom who did that?

3          MR. EDELMAN:  Correct.

4          THE COURT:  All right.  And I was particularly

5     concerned with how Andrew Campos has been behaving, because

6     that was a matter of some debate we had as to whether the

7     Government, you know, had legitimate serious concerns about

8     whether he would confined.  So I'm glad to hear that.

9     Apparently, you've heard nothing contrary?

10          MR. EDELMAN:  At this point, we have heard nothing

11     contrary.  Defense counsel has given us access to the video

12     surveillance system outside the home.  I note Mr. Campos is

13     electing not to use any electronic devices, and just wanted to

14     use his landline during the pendency of the case --

15          THE COURT:  Right.

16          MR. EDELMAN:  -- which of course, we cannot monitor.

17     So there is no monitoring of his electronic devices because he

18     is not using any.

19          THE COURT:  My sense is that he has every incentive

20     to be compliant.  So I'd just like to check on that. Okay?

21          Now, we have three matters here that we have to

22     discuss today, if they are still viable.  I've made a note of

23     it.

24          We have Richard Martino's Motion to Amend the

25     Protective Order.  Mr. Sercarz is going to be speaking about

```
 1   that.  We have the request for modification of Andrew Campos'
 2   bail conditions so he can meet with his father without counsel
 3   present.  And then we have this issue -- I don't know if it is
 4   still is viable, about the unsealing of the relation letter.
 5           And of course, everybody else is here, and I'm
 6   willing to listen to any concerns that anybody else may have,
 7   but that's what I have on my agenda.  If there is anything
 8   else we need to discuss other than those three matters, maybe
 9   we can take care of that first.  Okay?
10           MR. EDELMAN:  I think it makes sense to take care of
11   those three first.  I have some more housekeeping matters we
12   can address then.
13           THE COURT:  The rest will be housekeeping matters?
14           MR. EDELMAN:  Yes, I think so.
15           THE COURT:  Oh, so let's deal with that.
16           I don't know whether Mr. Mazurek really is concerned
17   about the motion to unseal the relation letter or not.  Let me
18   hear from you.
19           MR. MAZUREK:  Yes.  Thank you, Judge.
20           Your Honor, my understanding is that, obviously, the
21   case has been determined to be randomly selected, that you're
22   assigned --
23           THE COURT:  I've been randomly selected.  There's no
24   question about that.
25           MR. MAZUREK:  Yes.  And that the relation letter did
```

1    not result in a change --

2              THE COURT:  Right.

3              MR. MAZUREK:  -- in who was in your random selection

4    as the presiding judge in the case.  Nonetheless, Your Honor,

5    I still think under, as indicated in our letter, under Local

6    Rule 50.3.2(c)(2), that the Government is to promptly -- the

7    parties may promptly move to unseal the notice once the need

8    for ex parte and under seal filing no longer exists.

9              The Government has indicated in very broad stroke

10   that those concerns still remain with respect to the totality

11   of that letter.  Your Honor, I think there is a clear need

12   for, under public transparency and fairness, to unseal that

13   letter to the extent that it does not contain information that

14   would be somehow affecting the privacy interests or the

15   Government's interests in --

16             THE COURT:  So let me assuage your concerns.  All

17   right?  First of all, I assume you don't want me to reassign

18   this case to Judge Cogan?

19             MR. MAZUREK:  I'm very happy to be where I am, Your

20   Honor.

21             THE COURT:  You didn't have to say that.

22             And I can understand why good counsel would want to

23   gather all the information that he or she can get his or her

24   hands on that could bear upon the case.

25             So I have read the retention letter.  All right?

```
1    And I can tell you I'm going to leave it stay exactly the way

2    it is for good and sufficient reasons.  And I don't want to go

3    into it any further.  I don't think it's appropriate to do so.

4            I just want to assuage your concerns that I didn't

5    take the Government's representation at face value.  I also

6    read it carefully.  I think the application to keep it all

7    under seal at the present time is appropriate.  So I just want

8    to let you know that.

9            MR. MAZUREK:  Judge, would there be one exception to

10   that, since the -- I guess the letter itself was relating to

11   cases that have been previously assigned and are public

12   indictments with respect to assignments to Judge Cogan.  To

13   the extent they are, I would ask that those cases be known to

14   us as relevant information or material that could be relevant

15   to assist us in the preparation of the defense.

16           THE COURT:  Mr. Edelman, you have all these cases

17   that have been filed, have been filed.  But let me hear from

18   you.

19           MR. EDELMAN:  First, I note, Your Honor, that the

20   relation issue, as Your Honor noted, is moot at this point.

21   So there is no need for obtaining that letter and there's no

22   relief to be granted at this point.

23           As to Mr. Mazurek's latest request --

24           THE COURT:  They want to get their hands on

25   everything that could possible contain information that might
```

```
 1   be useful to them.

 2           MR. EDELMAN:  I don't doubt their intentions, but

 3   the other cases that were filed were filed under seal --

 4           THE COURT:  Under seal?

 5           MR. EDELMAN:  -- pursuant to orders issued by a

 6   judge, for reasons that were set forth to that judge and --

 7           THE COURT:  Right.

 8           MR. EDELMAN:  -- as part of those orders and as part

 9   of the Government's submission of its relation letter under

10   seal, we always state that when the need for sealing no longer

11   exists, we will go and request unsealing.  But at --

12   particularly at this early stage of the case, we believe those

13   orders should stay.

14           THE COURT:  Or monitoring it.

15           So we'll just keep it as it is at the present time.

16   I understand the tensions between the parties.  There is good

17   reasons by both sides to make their positions heard on the

18   record, and I understand that.

19           In any event, that's the current status and we'll

20   monitor it as we go along.  At the present time, things will

21   stay the way they are.  Okay?

22           The last thing -- well, let's take Mr. Martino's

23   motion.

24           Mr. Sercarz, you want to change the protective order

25   which you agreed to, and the five, six, seven or the other
```

1   defendants agreed to.  It's overstating.  I see these

2   protective orders all over the place.  Why should I make an

3   exception in your case?

4          MR. SERCARZ:  Your Honor, I'm speaking for myself

5   and I believe on behalf of the other attorneys who signed the

6   protective order and who joined in seeking to amend some of

7   its terms, and who joined me in seeking to amend some of its

8   terms.

9          I will tell you this:  I signed the order as -- with

10  the understanding that signing the order was a precondition of

11  obtaining discovery from the Government.  Number two, I signed

12  it without knowledge of the nature of the discovery, the

13  volume of the discovery or the manner in which the Government

14  was going to designate the discovery as falling into one of

15  the two protected categories.  When I --

16         THE COURT:  I'm not going to preclude --

17         MR. SERCARZ:  -- came to appreciate the volume of

18  discovery and the nature of some of the discovery in this

19  case, I contacted Mr. Edelman right away.  I informed him of

20  my objections.  I endeavored to negotiate changes in the

21  language of the order, and it was when Mr. Edelman declined my

22  invitation to change the order that I told him I would be

23  rasing these objections, and in order that he not feel

24  blindsided -- and I believe he'll back me up on this -- I told

25  him not to serve me with the discovery directory or any of the

1    discovery, so he wouldn't feel that by signing the order and

2    then arguing as to its content might prejudice him in any way.

3           THE COURT:  Let me give you some comfort.  I am not

4    at all suggesting that it's inappropriate for you to make this

5    application.  Things happen as we move along --

6           MR. SERCARZ:  Fair enough.

7           THE COURT:  -- in preparing for a defense, and I

8    understand that you are in receipt of information which you

9    may not have had when you signed the protective order.  So I'm

10    not precluding it.

11           But let's get to the heart of it.  If I see this

12    correctly, your concern is that it's too burdensome for you to

13    be saddled with all this information at your office, I guess,

14    and you want to have your client have access to this

15    information so you don't have to be under that type of

16    pressure.  Am I reading that wrong?

17           MR. SERCARZ:  Frankly, it's more than that, and I'd

18    like to put it in another form -- and before I explain my

19    concerns, Your Honor, those concerns that caused me to doubt

20    my decision in signing it -- let me give two hypotheticals,

21    Your Honor, which are likely to occur in a case such as this.

22           We get either transcripts or and/or tape recordings

23    in this case that are designated in the restrictive confines

24    of the witness-protected discovery material category.  It

25    emerges that the participant in the conversation other than

1    this defendant is prepared to talk to us about the content of

2    that recording.

3           So I do or one of the other attorneys in this room

4    does what any good defense attorney would want to do:  Make

5    the appointment, we go down, and we're prepared to discuss

6    with that individual the conversation that he engaged in with

7    our client.

8           We go with an investigator who can record accurately

9    what the witness says.  When we ask him about the

10   conversation, the context, the meaning of terms, and in order

11   to refresh his recollection, we desire to copy, photocopy the

12   transcript of the conversation in order to refresh his

13   recollection.  We're precluded from engaging in that

14   photocopying process by the restrictive category that the

15   Government has confronted us with here.

16          If we want to give -- never mind our investigator --

17   copying it for the benefit of the investigator is a violation.

18   If we want to give a copy to the witness, that is a further

19   violation.

20          I respectfully submit, Your Honor.  I've been around

21   the block a few times in the courthouse --

22          THE COURT:  I like your choice of words.

23          MR. MAZUREK:  No pun intended.  No pun intended.

24          MR. SERCARZ:  I've signed a few of these orders,

25   Your Honor, but this Court has also a wealth of experience at

1    its disposal.

2            THE COURT:  What exactly do you want specifically?

3    You want a copy the transcript?

4            MR. SERCARZ:  The first provision of this order says

5    we're not allowed to use these materials in anyway other than

6    to prepare our cases for trial.

7            The more limited protected category says that we are

8    limited to sharing it with our investigator, with co-counsel,

9    and if we need to share it with anyone else, we can do so if

10   they sign the order -- for example, an investigator and the

11   like -- bind us by the categories of the less restrictive

12   confines --

13           THE COURT:  Mr. Sercarz, let's be very focused and

14   real.

15           MR. SERCARZ:  I'm trying.

16           THE COURT:  You want copies?  You want to have

17   copies -- is what you've told me -- of the wiretap

18   transcripts, right?  You want to go over and make copies of

19   them and show them to your client?  I think that was what you

20   just told me?

21           MR. SERCARZ:  Yes.

22           THE COURT:  Okay.  Well, let's start there.  Let's

23   start with that.  You want to be able to copy it, to show them

24   to your client when you visit with your client and discuss the

25   case with him?

1          MR. SERCARZ:  And -- and given the wealth of

2    material in this case, I'd like my client -- who is confined

3    to his home when he's not in my office -- to be permitted to

4    take the copies home with him with the understanding that

5    disseminating them any further would be a violation of his

6    bail conditions and a violation of the order.

7          THE COURT:  Okay.  Listen, Mr. Edelman, I think what

8    he wants, as a practical matter -- maybe I have it wrong -- he

9    said when he meets with his client, he wants to be able to

10   show him something tangible.  I don't understand that.  It

11   seems since he has the wiretaps, he wants to make a copy of

12   this?  I don't get it.

13         MR. EDELMAN:  I want to be clear that there are two

14   categories of material, wiretaps --

15         THE COURT:  Right.

16         MR. EDELMAN:  -- and oral communications.

17         THE COURT:  Right.

18         MR. EDELMAN:  The vast majority of the documents are

19   not at issue.  The Government is allowing the wiretaps and

20   those oral communications to be possessed by the defendants in

21   their own home.  That is not what we're talking about.

22         We're talking about a limited subset of the most

23   sensitive information which reveals the Government's

24   witnesses, and the majority of that limited category are

25   consensual recordings.  We do hear and very often, it is

```
 1   obvious to determine who the Government's cooperating witness
 2   is during the course of that tape recording.  It is that very
 3   limited portion that we're seeking these extra protections
 4   over.
 5            THE COURT:  Well, what kind protection are you
 6   talking about, redaction here?
 7            MR. EDELMAN:  We're asking -- and this is a
 8   provision that is entered in many different cases and
 9   particularly, cases such as these -- we were asking that those
10   recordings not be allowed to be possessed by anyone other than
11   defense counsel.
12            So if the defendant wants to hear them, he can go to
13   defense counsel's office or vice-versa, and can listen to them
14   and review those materials.
15            THE COURT:  How extensive is this?
16            MR. EDELMAN:  So these consensual recordings -- I'll
17   first note and we put this in our letter of response --
18   Mr. Martino is not on any of these recordings.  Many of the
19   other defendants are, but at least as to Mr. Martino, he's
20   not.
21            THE COURT:  It still could be relevant.
22            MR. EDELMAN:  It could be relevant.
23            We have estimated there is -- it's a large number.
24   It's approximately 105 hours of consensual recordings, plus
25   documents, applications that reveal the Government's
```

1    witnesses, et cetera.

2            THE COURT:  All right.  So now -- so I understand

3    that.  The defendant can have access and listen to that at

4    counsel's office, is the way it presently is, right?

5            MR. EDELMAN:  Correct.

6            THE COURT:  And counsel is saying that is very

7    burdensome to them to be able to manage that.  Is there a

8    better way of doing that?  I think that's what they're saying.

9            MR. EDELMAN:  I understand that, and we're trying to

10   be reasonable wherever we can, but this is at the heart of the

11   most sensitive material the Government has.

12           And to allow a disc to go out the door to a

13   defendant, to an investigator, to -- but particularly to a

14   defendant, that disc can go anywhere from that point.  This is

15   a condition that is often imposed on defendants who are even

16   in custody.

17           THE COURT:  It makes some sense to me that if you

18   have a hard copy of things that could be distributed, you

19   know, throughout the world, theoretically, I could understand

20   why that's not a good idea.

21           At the same time, it's a balance and certainly,

22   counsel is entitled to have that information, and because this

23   is too burdensome, it would require the defendant -- who is

24   entitled to look at it also -- to have to do it in counsel's

25   office.  I don't know exactly what they want.  I'm not going

```
 1    to require you to make copies and distribute them.  Okay?
 2              But you have a concern about the fact that it's
 3    going to be burdensome to do this in your office, I think,
 4    right?
 5              MR. SERCARZ:  The limitation is that my client can
 6    have access of any sort of the material only when he is in my
 7    office?  Yes, it's burdensome for two reasons, and
 8    Mr. Edelman --
 9              THE COURT:  Well, what do you want?  I mean, you
10    have the information.  It's in your office.  He's there with
11    you.  He can stay there all day.  You can have associates
12    there with him.  I don't get why it's a problem.
13              MR. SERCARZ:  It's burdensome in several respects.
14              There are hundreds and hundreds of hours of tapes.
15    In order for my client or any one of these defendants to be
16    able to assist us by providing us, as I've said in the letter,
17    not only with a quick listen to the tapes, but with the words
18    used, the nuance and meaning, the meaning of any code, the
19    meaning of any shorthand terms, they need to listen to these
20    tapes over and over again.
21              THE COURT:  Let me ask you this.  Is there anything
22    that would preclude him from writing down anything that he
23    listens to?
24              MR. SERCARZ:  No.
25              MR. EDELMAN:  The order as written and as entered
```

1    has the restrictions over the material as well as any copies,

2    notes, documents or other information derived from.

3            THE COURT:  This is what he's talking about.  He

4    says you have a lot of material.  Even if it's going to be all

5    listened to at defense counsel's office, it's kind of hard to

6    remember it all, and how would the defendant have the

7    opportunity to really understand what's on that, and to review

8    it and to think about it if he doesn't have any access to it

9    except when he comes to the office and he has to look at

10   hundreds and hundreds of pages?

11           MR. EDELMAN:  He can do so there.  I note to the

12   extent that the office has some problems, if a paralegal or

13   associate even goes to the defendant's home, as long as that

14   person is in custody of the material.

15           MR. MAZUREK:  Who's going to pay for that?  Who's

16   going to pay for having people go to --

17           MR. EDELMAN:  I'm sorry.  But what's really

18   problematic is that we can't allow this sort of material that

19   is the most sensitive to just be taken by defendant and on his

20   drive home, if he meets -- someone meets with him, if he goes

21   home, if he gives it to someone to give out, there are a

22   myriad of possibilities -- and this is a condition that's

23   imposed on people who are even in custody.

24           THE COURT:  Is the lawyer allowed to make notes?

25           MR. EDELMAN:  Yes.  Absolutely.  They're allowed to

1    make notes.  The lawyer has to maintain possession.

2              THE COURT:  Is the defendant allowed to see the

3    lawyer's notes?

4              MR. EDELMAN:  Yes.  Those notes -- that is allowed

5    under the order.  They just have to be kept in the lawyer's

6    office.

7              THE COURT:  So notes could be taken?

8              MR. EDELMAN:  Correct, Your Honor.

9              THE COURT:  And whether it's the lawyer who writes

10   the notes, the defendant who writes the notes --

11             MR. EDELMAN:  Correct.

12             THE COURT:  -- anybody else, they just have to stay

13   in the office, and they can't go back with the defendant?

14             MR. EDELMAN:  Correct.

15             THE COURT:  What's wrong with that?

16             MR. SERCARZ:  Your Honor, take it to the next step.

17   What about an investigator?  Everyone here is going to make

18   use of an investigator in trying to assist them in handling

19   this case.  The investigator is not allowed to take them.

20             THE COURT:  Is the investigator allowed to come to

21   the lawyer's office to look at the notes the lawyer has?

22             MR. EDELMAN:  Yes, Your Honor.  He cannot take them

23   and go out with them.

24             THE COURT:  They could look at his notes?

25             MR. EDELMAN:  Correct.

1          THE COURT:  They're not going to be taking -- note

2   taking.  We are not going to preclude anybody from having

3   access to those notes.  The issue is whether they can leave

4   the office of the lawyer.

5          MR. SERCARZ:  I understand.  The operative word the

6   Government uses is "dissemination" with regard to their more

7   restrictive type of protected material.

8          Let's go back, if you don't mind, Your Honor, to the

9   hypothetical with which I began my comments.  We want to

10  confront one of the witnesses to this conversation with what

11  they said to refresh their recollection and find out why they

12  said it --

13         THE COURT:  You'll have those notes.  You'll have

14  all those notes.  You can talk to those witnesses.  You can

15  refer to your notes.  You're allowed to do that.

16         MR. MAZUREK:  Can I just add --

17         MR. SERCARZ:  Even copying -- even copying portions

18  of a transcript for the purpose of having the investigator

19  present and knowledgeable about the conversation is

20  dissemination.  Showing the witness the transcript is

21  dissemination.  And I respectfully submit, Your Honor, this is

22  reaching the stage where it violates due process, particularly

23  --

24         THE COURT:  Mr. Mazurek, you want to speak also?

25  You are chomping at the bit, and I'm going to allow you to

1    interrupt Mr. Sercarz.

2            MR. SERCARZ:  Is this a reflection of my argument so

3    far?

4            MR. MAZUREK:  Judge, I just want to put this into a

5    little bit clearer perspective.  We're not saying that the

6    standard protective order is not appropriate.  It is.  And

7    those protections are pretty severe.  They come in every case.

8            And every client has to sign this.  Everyone in our

9    staff has to sign it.  Every investigator has to sign it.  If

10   it's violated, then you have the ability to hold that person

11   in contempt of court.

12           Paragraph three is just an additional set of

13   restrictions that I believe are just too burdensome and hard

14   to really understand what we're even allowed to do, when it's

15   not necessary to protect the information.

16           THE COURT:  Those restrictions are that nobody is

17   allowed to take any of the papers out of the lawyer's office.

18           MR. MAZUREK:  Yes.  I'll throw a wrinkle to this,

19   Judge.  In today's age, I don't even write on pieces of paper

20   anymore.  I write on computers.

21           And I could access my computer on copies or I

22   download it on it my laptop and bring it home with me.  Am I

23   not permitted to do that?  Am I not allowed to remotely access

24   my firm's FTP site, which has copies of materials from

25   wherever I am, in order to prepare the case?

```
1              THE COURT:  Well, with modern technology, I would
2   think you don't have to be a scrivener, but you should be able
3   to use your laptop.
4              Mr. Edelman?
5              MR. EDELMAN:  There is no objection to that.  The
6   restriction is on, as Mr. Sercarz said, dissemination beyond
7   defense counsel, defense staff.
8              So he cannot take the -- he can go -- Mr. Mazurek
9   can home go home with his computer and work all night if he
10  would like.  He can't take those notes and send them off to
11  someone or print them out and give them to someone.
12             THE COURT:  He doesn't necessarily have to be wedded
13  to the office.  He can take the notes home.
14             MR. MAZUREK:  And that's all I'm asking for, is that
15  my client has that same opportunity, Your Honor.
16             MR. EDELMAN:  Well, that's a big difference, and
17  that's what we're concerned about.
18             MR. MAZUREK:  Because the truth is, in order for us
19  to --
20             THE COURT:  Let me understand this.  So you have
21  your notes on your laptop.  You're meeting with your client.
22  I assume you guys know your client.
23             MR. MAZUREK:  I just want my client to be able to
24  review the 2600 conversations at where he is located, where he
25  has to stay for 24 hours a day on home detention.  He might as
```

1  well do work while he's there, as opposed to having to come to

2  my office.  I have got to notify Pretrial Services --

3          THE COURT:  And I get it.  The reason why --

4          MR. MAZUREK:  The reason why?

5          THE COURT:  Mr. Edelman wants him to come to your

6  office is so there is nobody at home who could otherwise have

7  access to that information.

8          MR. MAZUREK:  But the information -- but Your Honor,

9  this is what the crazy thing in my mind is.  The information

10  is known once it's looked at.  It doesn't prevent anyone from

11  telling someone this is what the information says.

12          All you're doing is putting a burden on the defense

13  lawyers to have to find resources to have the person in our

14  office at particular times in order to review the material,

15  and it is a burden on their ability to help me prepare for the

16  defense at trial.

17          THE COURT:  Well --

18          MR. MAZUREK:  And it's a huge amount of material.

19  So I don't understand what additional value that the

20  Government gets by not letting me have my client --

21          THE COURT:  What else do you want?  You want

22  somebody to come to your client's home with the information

23  and have him look at it?

24          MR. MAZUREK:  Judge, he has a laptop.  There's a

25  laptop.  And by the way, his bail conditions allow him to have

1    a laptop.  We could give it to Pretrial Services.  They could

2    put their soft -- spy software on it, so they'll know exactly

3    what he's doing with it -- and at that point in time, he can

4    sit and review it, take his notes, and then we can have a

5    meeting that's productive.

6              THE COURT:  You want him to come to your office with

7    his laptop, take all those notes, and go home with them,

8    right?

9              MR. MAZUREK:  What's that?  I'm sorry?

10             THE COURT:  You want him to come to your office

11   with his laptop and take all the notes and put them on --

12             MR. MAZUREK:  I want him to come to my office with

13   his laptop, as I upload all of the discovery in the case.  He

14   goes home, where he's forced to stay 24 hours at a time, and

15   review the material on his phone, take his own notes and bring

16   them to my office, so we could have a productive meeting and

17   discussion about that.

18             THE COURT:  Well, what's wrong with that?

19             MR. EDELMAN:  First of all, it's not as if the

20   defendant is home 24 hours day with nothing to do.  He can

21   listen to every single wiretap.

22             THE COURT:  What is wrong with that?  He just wants

23   to be able to communicate what defense counsel will put down

24   on his laptop, the notes that the defense counsel makes.

25             MR. MAZUREK:  And under my client's bail conditions,

```
 1   it has to -- the spy software from Pretrial Services will be
 2   on it.  So they'll know exactly what he's doing on the laptop.
 3        MR. EDELMAN:  I don't think -- and I could be
 4   corrected -- I don't think this, quote, spy software can just
 5   detect any kind time -- any time a CD is burned or anything
 6   like that.  It certainly can't detect if someone else happens
 7   to be at home and is there.  Certainly doesn't -- and can view
 8   this material.  I don't think it detects whether something is
 9   printed from this computer.
10        This spy software that is spoken about -- and again,
11   we have Pretrial here -- but I don't think it could guarantee
12   that there are no copies to be made from this.  Once you get
13   beyond defense counsel, there is a huge risk that the hard
14   evidence can be distributed out.
15        And we're -- again, we're really trying to
16   understand the burdens imposed and trying to find a middle
17   ground.  It's a limited subset of this material.
18        MR. MAZUREK:  And the middle ground is the standard
19   protective order that is on all of the other paragraphs of
20   this protective order other than paragraph three.
21        We agreed to the others.  Just paragraph three
22   should be excised and the standard order that's always entered
23   in this courtroom and in the Southern District of New York
24   that is entered, as that is a fair balance between the
25   Government's interest of concerns of dissemination of
```

1   material, and our ability and our client's due process rights.

2           THE COURT:  Okay.  Run that by me again?

3           MR. MAZUREK:  Right.

4           THE COURT:  You're specifically going to put

5   information on your laptop, and then you're going to share

6   that with your client, right?

7           MR. MAZUREK:  Yes.

8           THE COURT:  And you want it to be on his laptop?

9           MR. MAZUREK:  Yes.  We should have the same thing.

10  We should be working off the same thing.

11          THE COURT:  Just one second.  Just one second.  I

12  just want to be very concrete.  So it's not just on your

13  laptop.  It's going to be on his laptop, right?

14          MR. MAZUREK:  Yes.

15          THE COURT:  So if he gave -- Mr. Mazurek gave his

16  client his laptop, you think you can roll with that?

17          MR. EDELMAN:  Sorry?  If Mr. Mazurek gave the client

18  his laptop -- Mr. Mazurek's laptop?

19          MR. MAZUREK:  No, I've got a lot of stuff on my

20  laptop.  I'm not sharing it with my client.

21          THE COURT:  Well, I mean, what difference does it

22  make whether it's on Mr. Mazurek's laptop or his own laptop?

23          MR. EDELMAN:  It's not the device that is

24  necessarily the issue.  It's the possession.  So whose laptop

25  it is, it's the defendant going home with extremely sensitive

1    material on his own, essentially able to do whatever he would

2    like.  That is the Government's concern.

3              THE COURT:  If he's going to have that information

4    anyway --

5              MR. EDELMAN:  Information?  Yes.  But there's a big

6    difference, Your Honor, between knowing something and being

7    able to show it, have a tape that can go out into the

8    community, and that voice goes around, and then it's -- the

9    risk to a witness is exponentially increased.

10             The hard evidence -- and we've cited one case which

11   explains the distinction -- having hard evidence, something to

12   wave around and show -- this person has cooperated with the

13   Government -- is at increased -- greatly increased risk.

14             And so for wiretaps, all the other evidence, we're

15   happy to let them review it at home, but --

16             THE COURT:  But he's going to have information in

17   any event because Mr. Mazurek is going make it available to

18   him.

19             MR. EDELMAN:  He will be able to listen to and know

20   that information.  What he will not able to, we submit, is

21   have a hard copy, whether it's a hard disc copy or a hard

22   paper copy that can then go who knows where.

23             THE COURT:  Okay.  This distinguished gentleman

24   wants to say something now, otherwise, he would not be

25   standing there.

```
 1            MR. BOOTH:  Correct, Your Honor.  Christopher Booth
 2   for Mr. Kocaj.
 3            There is one other restriction that I find is
 4   unreasonable with respect to --
 5            THE COURT:  Beyond this one now?
 6            MR. BOOTH:  Yes, Your Honor.  It's related to it,
 7   but it's an additional one.
 8            It says that counsel cannot share with each other
 9   this information in this protected class.  So if I listen to a
10   conversation that involves a co-defendant and some other third
11   party, we can figure out who the witness is.  I can't confer
12   with Mr. Mazurek or anyone else to find out what they know
13   about this participant.
14            THE COURT:  What do you say about that, Mr. Edelman?
15   Seems like the lawyers should be able to talk to each other.
16            MR. EDELMAN:  I'm not sure that's the reading of
17   this paragraph.
18            THE COURT:  Let's make it definitive so that it's
19   clear today.  My guess is that the lawyers should be able to
20   chat with each other about conversations.
21            MR. EDELMAN:  We don't object to one lawyer calling
22   another lawyer and saying, hey, on tape number five, this
23   thing is there.  What do you think?  That -- and I don't
24   believe that is covered.
25            Again, it is the physical dissemination when I say
```

1   physical.  So the file going, the transcript going, the disc

2   going.  That is what we're concerned about.

3            THE COURT:  Why can't it go from lawyer to lawyer?

4            MR. EDELMAN:  We would be willing -- we have that

5   provision --

6            THE COURT:  The lawyers have a hard enough job as it

7   is.  Why can't they at least become accommodated, so they can

8   see the information without their having to be imposed upon

9   without restriction.  I don't understand that.

10           MR. EDELMAN:  I guess the only thing is, I'm not

11  sure why -- not every defendant necessarily gets every single

12  tape.  So if a tape showing one witness goes here, why that

13  person needs to send that tape -- send that tape to another

14  lawyer.

15           But I will note, we have that provision for the

16  broader category of less restrictive material, allowing

17  sharing amongst defense counsel pursuant to a joint defense

18  agreement.  If that is the sticking point, we can have a

19  similar provision with respect to the protective order.

20           THE COURT:  Why don't we at least do that?  All

21  right?  We'll try to make life a little easier for lawyers who

22  have a hard enough job as it is.  Okay?  And I don't see that

23  there is any problem there.

24           So the lawyer-to-lawyer communication will be open,

25  and we can deem that we're making this on the record here.  I

1   don't know that we have to put it in more specific language.

2   If there is any problem in its implementation, you'll come

3   back and you'll talk to me, but at least we have accomplished

4   that.  Okay?

5            MR. MAZUREK:  Can we get rid of paragraph three?  We

6   want to get rid of that paragraph.  Let's get rid of that

7   paragraph.

8            THE COURT:  I'm not getting rid of that paragraph

9   three.

10           MR. MAZUREK:  I'm very happy to go home and begin

11  the preparation --

12           THE COURT:  We're not going to get rid of paragraph

13  three.  So my sense is, we're going to leave it stay at the

14  present time the way it is, and we'll monitor it as we go

15  along in the real world.  All right?

16           So if you are really overburdened, if you have any

17  particular problems, you can come back and talk to me about

18  it.

19           But right now, I don't have a comfort level in

20  letting the defendants have access and copies of all this

21  material, because I do agree with Mr. Edelman that there is no

22  effective control on the dissemination of that material.  So

23  that's my take right now.  So you win some and you lose some.

24  Let's see how it goes.

25           MR. MAZUREK:  But with one qualification for that

1    which I think is really important, is that we be able to show

2    potential witnesses information from those recordings or that

3    material.  Right now, that doesn't -- that's not allowed in

4    paragraph three.

5              THE COURT:  The information that you glean from

6    reviewing it, you want to be able to share that with potential

7    witnesses?

8              MR. MAZUREK:  Yes.  I would like them to listen to a

9    recording.  Tell us, does this refresh your recollection?  Did

10   this happen, for example.

11             THE COURT:  Mr. Edelman, they want to be able to

12   speak to the witnesses and say, "Did you say this?  Did you

13   say that?"  I guess, right?

14             MR. EDELMAN:  I think that is not barred by the

15   agreement, saying did you say this, did you do that.  What

16   crosses the line is the playing of the tape for a witness.

17   Now we're talking about people in the community, other members

18   and associates of organized crime.

19             THE COURT:  Anyway, let me understand.  So the

20   lawyer can say, I made notes here.  I think I faithfully have

21   written down what I heard.  This is what I heard.  And then

22   the lawyer can share that with the respect to the witnesses,

23   but cannot play the actual tape?

24             MR. MAZUREK:  That's crazy.

25             MR. EDELMAN:  My response --

```
 1              THE COURT:  You say it's crazy?

 2              MR. MAZUREK:  It's crazy.

 3              MR. EDELMAN:  Can I least respond to Your Honor?

 4              THE COURT:  Just one second.

 5              MR. EDELMAN:  Thank you.

 6         It's not crazy because then that person -- we're

 7    talking about people on these tapes who are other members and

 8    associates of organized crime.  So you're now saying I'm going

 9    to play this tape of a cooperating witness and play it for

10    this person.  That is a line that now that person can

11    disseminate all throughout the community --

12              THE COURT:  So why can't the same thing happen if we

13    have a very good note-taker, it's on the laptop, those notes,

14    right?  They are very extensive.  They can even copy verbatim

15    what's on the tape, right?  Mr. Mazurek could sit on his

16    laptop, that he has that and he plays it to a witness.  What

17    difference does it make whether he does it that way or whether

18    the actual tape is played?

19              MR. EDELMAN:  Again --

20              THE COURT:  Just explain -- I want to see the logic

21    of it.  It's the same substantive thing we're talking about.

22              MR. EDELMAN:  I think there's a difference between

23    hearing and hearing words about that.  I think that is the

24    distinction.

25              I would submit to the extent Your Honor is
```

1    considering that, at least that witness would have to sign the

2    protective order and agree to be bound by its terms.  If he is

3    listening to the most sensitive material in this case, at

4    least that's some level of protection.

5              THE COURT:  Well, ask counsel whether he is willing

6    to do that, but you tell me.

7              MR. SERCARZ:  Your Honor, if I may, I would urge the

8    Court to consider the context in which it should rule just on

9    this limited request for an expansion of the order.

10             The protective order as a whole says you can't make

11   use of this material other than for legitimate purposes of

12   trial preparation, or not even talking about --

13             THE COURT:  Talk to me about -- look, you guys here

14   are gaslighting me.  I'm focusing now on something very

15   specific.

16             Counsel just said they're willing to allow the

17   witnesses to hear the actual words spoken on the tape if they

18   sign a protective order.

19             MR. SERCARZ:  Me, too.  I'm focusing on that, too,

20   Your Honor.

21             THE COURT:  Well, tell me --

22             MR. SERCARZ:  There's a marginal difference

23   between --

24             THE COURT:  That's not acceptable?  Is that not

25   acceptable to you, right?

```
 1          MR. SERCARZ:  I need to go further, and the reason

 2  is as follows:  If I'm interviewing the witness who is on the

 3  other end of the conversation, and I simply say, I took notes

 4  and here's what you said, the witness can greet my comments

 5  with skepticism.

 6          But if I can confront the witness with his own words

 7  on a tape recording or in a transcript, I may be able to evoke

 8  a response I would not otherwise receive, and that's the

 9  difference, Your Honor.  It goes to our right to prepare the

10  case for trial, and to confront the witnesses against us.

11          THE COURT:  Can't you imitate that voice?

12          MR. SERCARZ:  I'm sorry?

13          THE COURT:  Can you get a good actor to imitate that

14  voice?

15          MR. SERCARZ:  Your Honor --

16          THE COURT:  Ask Mr. Riopelle.  He probably has

17  access to people who could do that.

18          MR. SERCARZ:  He would be terrific, Your Honor.

19  Either that or he would scare them away.

20          THE COURT:  All right.  Let's get serious about

21  this.  I'm trying be very focused and be fair to everyone.

22          MR. SERCARZ:  I am, too, Your Honor.  And I

23  respectfully submit -- I respectfully submit the Government

24  has to allow us the latitude to prepare our cases and their

25  protective order should be, according to law, the least
```

```
 1    burdensome solution.
 2              THE COURT:  I respectfully submit that I note that.
 3    You don't have to say that to me.
 4              MR. SERCARZ:  Okay.  May I remind you, we're even
 5    not talking about giving it to a defendant, let alone another
 6    --
 7              THE COURT:  And may be mentioning having getting
 8    something I was inclined to give you.
 9              Mr. Mazurek, do you wish to say anything else?
10              MR. MAZUREK:  Yes.
11              Judge, I would agree that the protective order --
12    what the protective order provides is that the investigator
13    has to sign that he is not going to disseminate the material.
14              But if we have to ask a witness to sign a protective
15    order before they talk to us?  You know how hard it is to get
16    witnesses to speak to defense counsel.
17              THE COURT:  Yes.  I've had difficulty.
18              MR. MAZUREK:  It's hard.
19              THE COURT:  Focus the issue, Mr. Sercarz.  Can we
20    focus here?  I'm getting old.  I've got to really work hard
21    and stay focused --
22              MR. SERCARZ:  I'm right behind you.
23              THE COURT:  So I can keep would up with your words
24    of wisdom.  Okay?
25              MR. SERCARZ:  Yes, Your Honor.
```

1              THE COURT:  The focus issue is whether or not the

2     witnesses should be allow to hear the tape, rather than to

3     just have them fully and accurately reported to the witness by

4     counsel.  So it's a very narrow thing.

5              And I'm not so sure there is anything wrong with

6     letting them listen to it.  I mean, you know, otherwise, I

7     mean, depending upon whether counselor is a good scrivener or

8     not a good scrivener, whether he gets it down right or not

9     right and we have all these collateral concerns, there's

10    nothing like the real deal.  I'm inclined to let them do that,

11    just for that limited purpose.

12             MR. EDELMAN:  I still disagree, but I understand,

13    Your Honor.

14             But if we're doing that, then someone now has heard

15    the most sensitive information, if that's --

16             THE COURT:  Well, I know, but that person's going to

17    know that information, but in any event, it's just the way in

18    which it is communicated to them.

19             MR. EDELMAN:  I understand, and still submit there

20    is a difference between saying I heard --

21             THE COURT:  I see the difference, but I don't really

22    see it as a substantive difference that really shakes my

23    brain, is what I'm saying.

24             MR. EDELMAN:  Understood.

25             THE COURT:  So let him do that.  We'll see how it

```
 1    works.  We're going to come back again if there are any
 2    problems.  We're here to help you all out.
 3              MR. EDELMAN:  Are we requiring that witness who
 4    hears this limited information to sign the protective order?
 5              THE COURT:  Well, I don't think so because I think
 6    it's an imposition on the witness.  It's not practical, I
 7    don't think.  I don't think it's realistic.
 8              But, look, substantively, I'm not disagreeing with
 9    you.  I just think that I don't want to put counsel under the
10    burden of having to worry about getting every word down right
11    or whether he characterizes it correctly.  Let him hear the
12    real thing.
13              I think we're really arguing, though, over nothing
14    of substantive significance, though I understand your nuance
15    argument.  So we're going to amend the protective order for
16    that purpose.
17              MR. EDELMAN:  Understood.
18              THE COURT:  In all of the cases, it's going to stay
19    the same for the present time, and then we'll revisit it as
20    need be in the future.  Okay?  So we have accomplished that.
21              Now, we have one last thing.
22              MR. COLTON:  Your Honor, if I may, just very
23    briefly.
24              THE COURT:  Yes.
25              MR. COLTON:  Glenn Colton for Mr. Simonlacaj.
```

1          The order also provides that defense counsel and

2     defense staff can't make copies.  I just want to make sure

3     that if I have a copy and my associate has a copy, that's

4     okay, but the order says it isn't, and I just want to make

5     sure.

6          MR. MAZUREK:  Can I suggest -- I'm going to rewrite

7     this thing and submit it to Mr. Edelman, and we'll figure it

8     out.

9          THE COURT:  Talk to each other again.  All right?

10         MR. EDELMAN:  As we have been willing to do and have

11    done.

12         THE COURT:  Look, we're having a nice conversation

13    today.  We see this is no easy thing.  They always require the

14    judge to balance things out.  My understanding is we want to

15    help counsel out.  All right?  They have a tough enough time

16    as it is representing clients in a very difficult case, right?

17         MR. EDELMAN:  Understood.

18         THE COURT:  So my sense is we try to help counsel as

19    best as we can without causing any egregious harm to the

20    interests of the Government.

21         So talk to each other about it and if, you know, you

22    can accommodate counsel in this new era, where we have laptops

23    and iPhones and all this other stuff, right?

24         Trying to do -- I think you've got some focus from

25    my perspective today.  We hope it will aid everybody in

1    ongoing discussions.  We made some specific rulings today

2    which we have a record of, and we can't accomplish every

3    single nuance of many things in one sitting.  We have to sort

4    of phase this in as we go along.  After all, we want to

5    collectively try to be fair to everybody.  Okay?

6              MR. EDELMAN:  Understood.

7              THE COURT:  So far so good?  Anybody else want to

8    talk before we move to the next thing?

9              Mr. Sercarz, you want to say anything else?

10             MR. SERCARZ:  No.  Thank you for hearing me, Your

11   Honor.

12             THE COURT:  All right.  So I have the last

13   application of Andrew Campos, and I think that his father is

14   George Campos.

15             They want to have a modification of bail conditions

16   so the father and son can meet without counsel present.  And

17   apparently, the meeting we're talking about is at Andrew

18   Campos' home, where he is under home confinement.

19             I guess there are a couple of grandkids around

20   there?

21             MR. EDELMAN:  Yes, Your Honor.

22             THE COURT:  How old are the children?

23             MR. EDELMAN:  Mr. Mazurek can correct me.  I believe

24   two are in college and two are in late teens.

25             THE COURT:  Okay.

1          MR. MAZUREK:  (Nods head affirmatively.)

2          THE COURT:  So when I look at the record here, a

3    couple of things strike me.  That there is George -- is George

4    Campos the father?

5          MR. EDELMAN:  Yes, Your Honor.

6          THE COURT:  He is charged in one count of the

7    indictment, right?

8          MR. EDELMAN:  He is alleged to be a Gambino soldier,

9    but he is charged in one count.

10         THE COURT:  The allegation, broad allegation?

11         MR. EDELMAN:  Correct.

12         THE COURT:  It's an allegation.  I don't know

13   whether it's true or not.  It's an allegation.

14         MR. EDELMAN:  Correct.

15         THE COURT:  But the one that's concrete is that he's

16   being charged with an OSHA violation?

17         MR. EDELMAN:  Yes, a conspiracy to make false

18   statements to a obtain OSHA cards fraudulently.

19         THE COURT:  Okay.  So I'm not, you know, diminishing

20   the importance of that, but it's not a crime of violence.

21   It's not extortion.  It's not any of the things that we

22   normally are accustomed to being concerned about.  We're not

23   as worried in terms of the balancing of all of these interests

24   with an OSHA violation as compared to the others.

25         Now, if it was not an OSHA violation, what would

1   Government's position be about letting him come to visit his

2   son and his grandchildren?

3          You know, the normal gut reaction is that you like

4   to support the family for many reasons.  And once again, there

5   is a balance here.  I understand the Government's position,

6   but you have kids involved.  And you have to think a little

7   bit about what's in the best interest of the children, I

8   think, too.

9          If, you know, people come and the kids see marshals

10  with them or if they see security people with them, I don't

11  know what kind of effect it might have upon the development of

12  these children.  I mean, you want it to be, I think, as

13  natural as it can be in terms of perpetuating and sustaining

14  the family relationship without causing unreasonable burdens

15  and hardships on the Government.

16         So that's the general overview I have.  I would like

17  to accommodate that.  Father and son relationships are

18  important, and George was not placed under any restrictions.

19         MR. EDELMAN:  Not many.  Certain restrictions, but

20  not many.

21         THE COURT:  Not many?  Okay.

22         And Andrew has a lot of restrictions, and I really

23  lowered the boom on him, right?  And he's been compliant.

24         Tell me what your real concern is.  I mean, if you

25  are worried about Andrew being an alleged bigshot in the

1   family, being able to use his 72-year-old father as the

2   conduit to do bad things, how realistic is that?

3            MR. EDELMAN:  I submit it is realistic, Your Honor.

4            THE COURT:  Really?

5            MR. EDELMAN:  The concern is around Andrew Campos

6   continuing to conduct the affairs of the Gambino crime family.

7            And with his father, it's his father.  Absolutely,

8   we understand that.  It's with a fellow Gambino soldier,

9   Gambino member, which goes a long way in why we --

10           THE COURT:  Wait, wait, wait.  The father, you are

11  concerned about that the father would be a natural conduit to

12  continue the conduct of the family business?

13           MR. EDELMAN:  That he can pass messages on behalf of

14  his son?  Yes, Your Honor, we are concerned about that.

15           THE COURT:  Well, why can't other people pass

16  messages as well?  These are their four grandchildren.  They

17  have items all over the place.  They have access to all sorts

18  of people who come to visit and without any restraints.

19           MR. EDELMAN:  That is why we have requested

20  Mr. Campos be detained.  We are concerned about those as well,

21  but we're in the spot that we're in, and we have one

22  co-defendant, fellow Gambino soldier who can pass messages

23  onto his grandkids.

24           THE COURT:  What other evidence do you have that the

25  father is a Gambino member?  You allege it.  I know that.

```
 1              MR. EDELMAN:  Correct.

 2              THE COURT:  But I see an OSHA violation.

 3              MR. EDELMAN:  I understand we have multiple

 4    witnesses who would testify to that as to where --

 5              THE COURT:  Well, that's for the trial.  I know

 6    that.

 7              MR. EDELMAN:  Understood.  That's Mr. George Campos'

 8    status in the crime family.

 9              But just as to the point as to the grandchildren,

10    there's no restriction between George Campos meeting with his

11    four grandchildren whenever they want, wherever they want at

12    any time.

13              THE COURT:  So let me ask you a dumb question.  Why

14    can't, theoretically, Andrew, this bad person, who hasn't

15    violated any of his conditions so far and if he does one, he

16    knows he's facing jail time.  He's under a lot of pressure.

17              Why can't he talk to one of his college students and

18    say when you see papa, will you please give this information

19    or give him this letter?  I'm trying to be realistic here, not

20    theoretical.

21              MR. EDELMAN:  Like Your Honor said, we're in the

22    situation of balancing risk and factors.

23              THE COURT:  Yes.

24              MR. EDELMAN:  And the risk of that, we submit, is

25    relatively low.  So we're not going to say he can't see his
```

1  children.  But the risk when you take out the children, and

2  you go direct from Gambino member to Gambino member, then for

3  us, that risk becomes too high to warrant the complete

4  association.

5           And again, we're not talking about marshals or

6  agents at a home.  It would really just be one attorney.  So

7  we're talking about one attorney, if that's what they wanted.

8  I'm not suggesting that's what --

9           THE COURT:  Let me understand what it -- I don't

10 think they want that even.

11          MR. EDELMAN:  I understand.

12          THE COURT:  I don't think they want anybody there.

13          We could have people there.  The other family

14 members could be there.  This is going to be for purposes of

15 family occasions?  I mean, I would have a hard time.  You have

16 a birthday party.  You have a bris.  I guess that's not

17 relevant here -- that the family wanted.

18          I don't see why that should not happen here.  I

19 don't see the risk on those occasions to have communications

20 to disseminate that we should be concerned about.

21          And if he violates one condition, he'll probably go

22 back to jail.

23          MR. EDELMAN:  I understand, Your Honor.

24          It is so hard to find out whether the conversation

25 that Mr. Andrew had with George in person, whether it related

1    to the grandkids or related to the social club at their right,

2    something like that.  It is so hard to figure that out.  It

3    would impossible to do so.

4            We have the -- two of the grandchildren don't even

5    live at home.  So they're at college.  To the extent that

6    they're coming home, they can go see their grandfather and

7    visit him on any occasion.

8            THE COURT:  How about a family affair?  Birthdays,

9    you know, Christmas?  Thanksgiving?

10           MR. EDELMAN:  It's just impossible to monitor -- and

11   Your Honor let him out on very strict conditions:  No

12   association with co-defendant, no association with members of

13   organized crime.  And this would violate -- as it stands,

14   would violate --

15           THE COURT:  That's exactly my point.  I really

16   imposed enormous restrictions on him, and started the

17   proceeding by asking you whether there was any problem, and

18   you will continue to monitor him, right?

19           MR. EDELMAN:  I understand.  It's been three weeks

20   since Mr. Mazurek --

21           THE COURT:  But if he violates any condition, you

22   know, whether it's this or something else, he's got problems.

23   I just don't see him doing that, but maybe I'm having the

24   wrong reading here.

25           But I would hate to preclude a father and son and

1    family getting together, certainly for family occasions.  But

2    I think that's mean-spirited, under these circumstances, when

3    he's only charged with -- not only.  It's a violation.  I get

4    it.  But it's an OSHA violation.  It's not sort of a principal

5    part of your indictment that you have here.

6            And if he was charged with something really more --

7    what's the right word I'm thinking about -- susceptible to

8    physical criminal behavior, things of that nature, you know, I

9    might think differently about it, but he hasn't been.  And

10   there are no restrictions imposed on him.  So I'm inclined to

11   see whether he can -- give him a chance to monitor this thing.

12           Now, we can impose some restrictions.  He can see

13   his family, and I guess the logic thing is that he should see

14   his family, not just his son.

15           MR. EDELMAN:  But there is not restriction over, as

16   it --

17           THE COURT:  At his home.  He can come to the home.

18   His son can be there.  He's going to be there when the

19   children are there.  What's wrong with that?

20           MR. EDELMAN:  Well, for all the reasons I've stated.

21           THE COURT:  No, but I'm not going to allow him to

22   come to the home just to talk with his son one-on-one.  But I

23   don't want to preclude him from coming to the home for family

24   occasions when the other two are visiting, things of that

25   nature.  And I think that's a fair balance to start with.

```
 1              MR. EDELMAN:  Understood, Your Honor.

 2              In that case, we would ask that there be -- if these

 3    are preplanned family events --

 4              THE COURT:  Let him notify --

 5              MR. EDELMAN:  Notify Pretrial.

 6              THE COURT:  Yes.

 7              MR. EDELMAN:  And we'd also ask if -- again, we're

 8    trying to accomplish that goal to have no other contact.  So

 9    no telephonic, no messaging.

10              THE COURT:  Well, let's take it one step at a time.

11              Let's notify Pretrial to come and visit the family

12    next Friday, and the kids are going to be home from college

13    and the other boys are there.

14              How old are the other kids again?

15              MR. MAZUREK:  They're teenagers.

16              THE COURT:  And they're not living at home?

17              MR. MAZUREK:  Two of the teenagers are living at

18    home.  Two are at home, two are at college.

19              THE COURT:  And you know, just let them notify

20    Pretrial that I want to go see the kids next Tuesday or next

21    Wednesday.  What's wrong with that?

22              MR. WALLENSTEIN:  Judge, could you just clarify that

23    for me?  Mr. Campos can go simply by notifying Pretrial,

24    rather than seeking Pretrial's permission?

25              THE COURT:  Well --
```

1          MR. WALLENSTEIN:  In other words, you're giving him

2     permission?  I've just got to tell him.

3          THE COURT:  Yes.  I think we can start off by

4     notification.  Let's see how that works, how frequently he's

5     going to do that.  Watch it.

6          But he has to say I'm going to, you know, I want to

7     visit my kids and my grandkids on this particular occasion,

8     that communication.  And we'll start off by giving him a

9     little bit of human discretion to decide whether he wants to

10    go see the kids.  It's not going to be every -- if I see he

11    wants to do it everyday, then may be we'll think a little bit

12    about it.  But reasonable accommodations.

13         MR. WALLENSTEIN:  My client lives in Dutchess

14    County.  It's a schlep to do it every day.

15         THE COURT:  Okay.  Does that make sense?  I'm trying

16    to catch the essence of it.  It's hard to put these things

17    down in black and white.  But I think that's a fair

18    compromise.  Let's see how it works.

19         MR. EDELMAN:  Understood.

20         THE COURT:  Okay.

21         MR. WALLENSTEIN:  Thank you, Your Honor.

22         THE COURT:  Now, is there anything else anybody

23    else --

24         Ah, I knew I shouldn't have asked this question.

25    Who wants to talk about it?

1          MR. BOOTH:  Your Honor, my client, Mark Kocaj, is on

2     bail conditions set by Magistrate Bulsara.  There was no

3     restriction on his ability to work.  Some co-defendants in

4     this case have a restriction that they cannot work in the

5     construction industry.  My client, who has worked in that

6     industry his whole life does not that have restrictions.

7          THE COURT:  You want me to impose that restriction?

8          MR. BOOTH:  I don't, but I need you to free him up

9     from the Government.  My client has a job opportunity lined up

10    with a construction company located in the Bronx, where he

11    wants to go and work.  He worked for them in the nineties and

12    the 2000s.

13         Pretrial Services is giving my client a hard time,

14    saying you can't work in the construction industry.  That's

15    not correct.  I conveyed this to Mr. Edelman, just to make

16    sure there is no problem there.  He has a problem with that.

17         My client needs to work to support his family.  His

18    kids are in college.

19         THE COURT:  There is no restriction at the present

20    time?

21         So Mr. Edelman, what's going on?

22         MR. EDELMAN:  Mr. Kocaj was released, over the

23    Government's objection, on home detention.  So the provisions

24    were, he was going to be home at all times.  There was no

25    contemplation of employment at that time.  He was only

```
 1    allowed out for attorney visits, medical visits.
 2              THE COURT:  He was released by Magistrate Judge
 3    Bulsara?
 4              MR. EDELMAN:  Correct.
 5              THE COURT:  Okay.  Go ahead.
 6              MR. EDELMAN:  And that was over our objection.
 7              So the issue of employment was not relevant because
 8    he was supposed to be home all the time, absent approval from
 9    Pretrial.
10              So now we're in this circumstance where he wants to
11    work, and we're not opposed to having Mr. Kocaj work.  The
12    problem is, he is charged in multiple counts, two different
13    charges -- first of all, he's charged with racketeering -- but
14    two different fraud-related charges relating to his work in
15    the construction industry, one of which involves bribery.
16    He's charged with a payroll tax violation.  He's charged in
17    separate indictments as part of this case with extortion,
18    extortionate collection of credit, in which Judge Bulsara
19    heard tapes of Mr. Kocaj making threats to harm people to
20    collect money.
21              So we're in that context, and Mr. Booth raised the
22    idea of working at this company -- and I'd rather not go into
23    all the reasons right now, but we do have concerns about that
24    company and its connections with organized crime and other
25    misconduct they may have committed.
```

1              So if Mr. Kocaj can get work outside of the

2     construction industry, we're generally amenable to that, but

3     --

4              THE COURT:  He may not be qualified to do anything

5     other than work in the construction industry.

6              MR. EDELMAN:  I understand, Your Honor, but it goes

7     to the heart of his misconduct in this case.

8              THE COURT:  I get it.  I get it.

9              Is there any way of monitoring?  On the one hand, we

10    like people to work.  On the other hand, you worry whether or

11    not something untoward could happen as a result of that.  So

12    what could possibly happen if he goes to work that we should

13    worry about as compared to his not going to work?

14             MR. EDELMAN:  A number of things.  He can -- he is

15    in a very similar position to commit the same types of crimes

16    that he committed that led rise to the charges in this case.

17    He can, by virtue of this company that -- again, I want to be

18    a little vague at this point -- has issues.  He may be exposed

19    to further violations.  He may be exposed to other associates.

20             THE COURT:  He's on home confinement now?

21             MR. EDELMAN:  Correct.

22             THE COURT:  So he would have to stay at home, and

23    that would sort of protect the Government from having him

24    exposed to the outside world?

25             MR. EDELMAN:  Correct, Your Honor.

```
 1              THE COURT:  All right.

 2              MR. EDELMAN:  And again, I'd stress that Mr. Kocaj

 3    is charged with a separate indictment with making repeated

 4    threats to collect money -- I should say discussing his

 5    ability to collect money by making threats to others.  So

 6    there is an added element here as well.

 7              MR. BOOTH:  And Your Honor, Judge Bulsara and I

 8    listened to those tapes, and he had no problem releasing the

 9    defendant, and he tore apart those tapes, actually on the

10    record when he --

11              MR. EDELMAN:  Well, I have to -- well, just to

12    clarify the record, he didn't tear apart any tapes.  He

13    said -- I believe the word he used was, I find these tapes

14    very "troubling," but given his lack of criminal history, I'm

15    going to release him, over our objection.  And he didn't tear

16    apart the page and say that they don't say that he made any

17    threats or anything like that.

18              THE COURT:  All right.  I'm going to leave that

19    condition in place for the present time.  We can revisit it in

20    the future.

21              We have accomplished a lot today, and we have

22    assuaged some of these issues a little bit, and I think it's

23    enough for today.  We can always come back and talk about it

24    again further.  But I think we gone as far as I'm willing to

25    go today with staging and everything.
```

1          Now, tell me a little bit more, Mr. Edelman, about

2    what you have planned in terms of the development of the case

3    which may be not wind up in a trial.

4          MR. EDELMAN:  Sure, Your Honor.

5          So, as to the defendants who have had no issues with

6    the protective order, I've already disclosed a substantial

7    amount of Rule 16 to those defendants, and I expect, given

8    Your Honor's rulings today, will do so to the other defendants

9    as well.

10         THE COURT:  Right.

11         MR. EDELMAN:  But there is a very large amount of

12   discovery in this case.  Just as a quick recap for Your Honor,

13   there are multiple months of wiretaps, oral communications in

14   an office, multiple cell phones that were searched pursuant to

15   search warrants, the consensual recordings we detailed, as

16   well as a lot of documents that go to the heart of this case.

17         So we have begun that production and once we sort

18   out the rest of the protective order, we'll continue to do so,

19   and I believe that will allow plea negotiations to the extent

20   they are going to be fruitful, to happen obviously once

21   defense has request -- has an ability to listen to the

22   discovery material.

23         So I believe we are jointly requesting, for once,

24   that there be -- the next status conference date set a while

25   out.  Everyone is out of custody -- but to allow the discovery

1  productions to go forward and for plea negotiations to

2  continue, we are requesting a next status conference date of

3  May 28th at 2:00 p.m.

4      THE COURT:  I think I can accommodate that.  I think

5  I'll be here, hopefully, God willing.

6      Is that okay with everybody?  Okay.

7      MR. MAZUREK:  Yes, Your Honor.

8      THE COURT:  Now, anything else you wish to say?

9      MR. EDELMAN:  Two points, Your Honor.

10     I want to alert Your Honor to a filing -- of the

11  intent to make -- which is going to be a *Curcio* motion as to

12  likely two of the counsel.  I don't expect it will require --

13  we're not going to be seeking disqualification, but just in an

14  abundance caution, having a waiver for those.

15     THE COURT:  You're looking for some waivers?  All

16  right.  You'll let me know when you're ready to do that?

17     MR. EDELMAN:  Yes, Your Honor.

18     THE COURT:  Okay.  What else?

19     MR. EDELMAN:  The only other provision, is -- and we

20  did this, I believe in all of the arraignments -- is just

21  because we're before Your Honor for the first time, to ask

22  that the case be designated complex in light of all of the

23  number --

24     THE COURT:  I guess we should formally say that.  It

25  is obviously complex litigation.  So the speedy trial clock

1    stops running.  We don't have to repeat that every time we're

2    here.  Okay?

3              MR. EDELMAN:  Thank you, Your Honor.

4              So that's all we have from the Government.

5              THE COURT:  Okay.  Now, anybody else wish to say

6    anything now?  Everybody's happy with what we've been about to

7    accomplish in the middle?  Okay.

8              I hope everybody walks out of the room a little

9    happy and a little unhappy.

10             Mr. Sercarz, it's always a joy to see a smiling

11   face.

12             MR. SERCARZ:  Your Honor, may have a one moment?

13   I'm kind of happy.  I just have to talk to Mr. Dietsch.

14   (Confers with Mr. Dietsch.)

15             MR. WALLENSTEIN:  We're always happy to be here,

16   Judge.

17             THE COURT:  Okay, Mr. Sercarz?

18             MR. SERCARZ:  I'm happy.

19             THE COURT:  All right, folks.  Nice to see all of

20   you, and I have a lot of respect for the professionalism in

21   this room.  We'll see at you at the end of May.

22             MR. EDELMAN:  Thank you, Your Honor.

23             MR. MAZUREK:  Thank you, Judge.

24             MS. SHARKEY:  Thank you, Your Honor.

25             (Proceedings concluded.)